**Robert N. COLWELL, Charles R. Ellinger and Richard H. Abrams, Jr., Plaintiffs,**

v.

**SUFFOLK COUNTY POLICE DEPARTMENT and The County of Suffolk, Defendants.**

**No. 94–CV–1900 (FB).**

United States District Court, E.D. New York.

June 26, 1997.

Brian J. Davis, Certilman Balin Adler & Hyman, LLP, East Meadow, NY, for Plaintiffs.

Robert J. Cimino, Suffolk County Attorney by Herbert A. Smith, Jr., Craig D. Pavlik, Assistant County Attorneys, Hauppauge, NY, for Defendants.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiffs Robert Colwell ("Colwell"), Charles Ellinger ("Ellinger") and Richard Abrams ("Abrams"), employees of defendant Suffolk County Police Department (together with defendant County of Suffolk referred to collectively as "County"), brought suit against the County because each was denied a promotion within the Police Department. Colwell was denied promotion from Lieutenant to Captain; Abrams and Ellinger were denied promotions from Sergeant to Lieutenant. Plaintiffs alleged that they were denied these promotions on the basis of their physical disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213 (1995). Plaintiffs' claims were tried before a jury, commencing on March 10, 1997. On March 18, 1997, the jury returned verdicts in favor of each plaintiff. The jury awarded Colwell $70,636, and Abrams and Ellinger $65,683 each, for compensatory damages from the time they were denied their respective promotions to the date of the verdict. The jury further awarded each of the three plaintiffs $150,000 for future compensatory damages. The Court now determines that the record contains sufficient evidence to support the verdicts, and fashions appropriate remedial relief.

## I. THE COUNTY'S MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of plaintiffs' case, the County moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, and submitted a memorandum of law contending that: (1) all three plaintiffs failed to support their claims of

disability with sufficient medical testimony, and that testimony by the plaintiffs themselves could not form the basis of a finding of disability under the ADA; (2) all three plaintiffs were not "qualified" for the promotions they sought, with or without reasonable accommodation, for purposes of the ADA; and (3) all three plaintiffs failed to prove that the County intentionally discriminated against them on the basis of their disabilities.[1] Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law ("Def.Mem."). The Court reserved decision. At the close of all of the evidence, the County again asked the Court for judgment as a matter of law. The Court stated that it would continue to reserve. After the jury returned its verdicts, the Court withheld decision on the 50(a) motion, and gave the parties twenty days to submit additional memoranda of law on the motion, and to address remedial issues.

The County's Rule 50(a) motion should be denied. In so ruling, the Court has analyzed the sufficiency of the evidence in relation to the jury's findings. Although this mode of analysis normally applies to Rule 50(b) motions, the standard for determination is exactly the same for 50(a) and 50(b) motions. *See Raspente v. National Railroad Passenger Corp.*, 111 F.3d 239, 241 n. 3 (2d Cir.1997) ("the same standard applies under either subsection [of Rule 50]"). Furthermore, should the County make a 50(b) motion, it will be limited to the grounds raised in its 50(a) motion.[2] *See Holmes v. United States*, 85 F.3d 956, 962 (2d Cir.1996) ("Together, Rules 50(a) and (b) 'limit the grounds for judgment n.o.v. to those specifically raised in

the prior motion for a directed verdict.'") (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 54 (2d Cir.1993)). The Court will therefore proceed to adjudicate the reserved 50(a) motion,[3] bearing in mind that the Court's analysis will likewise apply to the County's Rule 50(b) motion, should that motion be made.

## A. The Applicable Legal Standard for Ruling on a Motion for Judgment as a Matter of Law

In order to prevail on a motion for judgment as a matter of law, the County must convince the Court that "when 'drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of [Colwell, Ellinger and Abrams], a reasonable jury could only have found for the [County].'" *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir.1996) (quoting *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995)). It is well settled that the Court may only grant the motion if "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or if the evidence is so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *Lambert*, 10 F.3d at 56 (2d Cir.1993). In making this determination, the Court "may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury." *Vermont Plastics, Inc.*, 79 F.3d at 277.

---

1. A motion for judgment as a matter of law pursuant to Rule 50(a) may be made at any time before submission of the case to the jury. A party must make a Rule 50(a) motion to preserve its right to make a Rule 50(b) renewed motion for judgment as a matter of law, which must be filed within ten days after the entry of judgment. Fed.R.Civ.P. 50.

2. Should the County wish to challenge the verdict as excessive, it must move for a new trial under Rule 59. *See D'Amato v. Long Island R.R. Co.*, 874 F.Supp. 57, 58 (E.D.N.Y.1995) (district courts review excessive verdict claims under Rule 59). A Rule 59 motion may be made in conjunction with a renewed motion for judgment as a matter of law. *See* Fed.R.Civ.P. 50(b).

3. Although the County made its 50(a) motion both at the close of the plaintiffs' case and at the close of all of the evidence, the Court considers these motions together to determine whether there was sufficient evidence to send the case to the jury. *See* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2533 (2d ed. 1995) ("A motion for judgment as a matter of law at the close of the plaintiff's case and a similar motion at the close of all of the evidence can be considered together in determining whether specific grounds were made sufficiently clear.")

## B. Elements of a Claim under the ADA

■ In order to establish a claim under the ADA, a plaintiff must prove that: (1) he is a qualified person with a disability; (2) the defendant intentionally discriminated against the plaintiff—that is, the fact that plaintiff was a qualified individual with a disability was a motivating factor in the defendant's decision not to promote him; and (3) as a direct result of the defendant's intentional discrimination, the plaintiff sustained damages. 42 U.S.C. § 12112; *see also Wernick v. Federal Reserve Bank,* 91 F.3d 379, 383 (2d Cir.1996) (citing *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131 (2d Cir.1995)).

## C. Mixed Motive

The Second Circuit recently reiterated that employment discrimination cases can be presented to the jury as either a "single issue motivation" or "dual issue motivation" scenario. *See Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 118–19 (2d Cir.1997); *see also Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992) (noting that employment discrimination cases generally fall into one of those two categories). These two scenarios are often referred to as "pretext" and "mixed motive" cases, respectively. In the mixed motive scenario, the Court asks the jury not only to determine whether the impermissible reason—in the present case, disability—was a motivating factor in the employment decision, but also "whether the defendant has established that it would have taken the same adverse action in the absence of an impermissible reason." *Fields,* 115 F.3d at 125 n. 4. The Second Circuit in *Tyler* explained the respective burdens of proof in the mixed motive case:

> If the plaintiff convinces the factfinder that the illegitimate factor played such a role, the employee has proved that the decision was made at least in part because of the illegitimate factor. At this point the em-

ployee is entitled to succeed subject only to the employer's opportunity to prove its "affirmative defense," . . . that is, that it would have reached the same decision as to [the employee's employment] even in the absence of the impermissible factor.

*Id.* at 1181 (internal quotations omitted) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, (1989); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Despite the perplexities often facing the trial court in determining the application and fashioning of mixed motive and pretextual jury charges, both parties agreed with the Court that the present case should be presented to the jury as a mixed motive case, Tr. at 910–11, 918–20, 954–56, 1046–48, since "the available evidence support[ed] a reasonable inference that 'permissible and forbidden motives coexisted.'" *Fields,* 115 F.3d at 122 n. 2 (quoting *Ostrowski v. Atlantic Mut. Insur. Cos.,* 968 F.2d 171, 185 (2d Cir.1992)) (noting further that the mixed motive charge is inappropriate where "there was either unlawful motivation or lawful motivation, but not both"). The Court therefore asked the jury two questions on the issue of intentional discrimination in respect to each plaintiff: (1) whether plaintiff's disability was a motivating factor in the decision not to promote him, and (2) whether the County would still not have promoted plaintiff for reasons having nothing to do with his disability. It was therefore possible for the jury to reach the conclusion that although the County took plaintiff's disabilities into account, any or all of them would not have received the promotion for legitimate reasons. The remedial scheme incorporated by the ADA specifically contemplates this possibility, and provides for a limited set of remedies in that instance. *See* 42 U.S.C. §§ 12117(a), 1981a(a)(2), 2000e–5(g)(2).[4]

---

4. The remedial section of the ADA, 42 U.S.C. § 12117, incorporates Title VII remedies. The Title VII provision applicable to the situation where the defendant proves that it still would not have promoted plaintiff is section 2000e–5(g)(2), which provides in pertinent part:

> On a claim in which an individual proves a violation . . . and respondent demonstrates that the respondent would have taken the same action in the absence of the [impermissible factor], the court—
>
> (i) may grant declaratory relief, injunctive relief . . . and attorney's fees and costs. . . .

## D. The Verdicts and Supporting Evidence

The jury found in respect to each plaintiff that he was a qualified individual with a disability, and that his disability was a motivating factor in the County's decision not to promote him. The jury further found as to each plaintiff that the County did not prove that it would not have promoted him for other, nondiscriminatory reasons.[5] The trial record offers ample support for each of these jury findings.

### 1. Disability

The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (2) a record of impairment that substantially limits one or more of the major life activities of the individual; or (3) being regarded as having an impairment that substantially limits one or more of the major life activities of the individual. 42 U.S.C. § 12102(2). Equal Employment Opportunity Commission regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Drawing all reasonable inferences in favor of the plaintiffs, as the Court must, the record is replete with evidence supporting the jury's factual finding that all three plaintiffs were disabled at the time they were passed over for promotion.

#### (a) Plaintiff Colwell

Testimony from both Dr. Robert Reiss ("Dr. Reiss") and Colwell was sufficient to support a jury finding that Colwell's chronic lower back injuries rendered him disabled for purposes of the ADA at the time he was denied promotion. Dr. Reiss characterized Colwell's condition as "chronic low back syndrome with left leg sciatica with increasing symptomatology." Tr. at 403. Colwell injured his lower back in 1979, while pushing a disabled vehicle off the road, *id.* at 199, and reinjured his back in 1984 when he fell on some icy steps. *Id.* at 201. Contrary to the County's assertion that Colwell's injury only limited his ability to stand in one place for an extended period of time, Def. Mem. at 6, Colwell testified that "I have excruciating pain in the lower back that travels down my left leg and the bottom of my left foot has pins and needles and it's numb," Tr. at 203, which impaired his ability to sit, stand and walk. *Id.* at 203, 209, 270. Colwell's injury also prevented him from lifting heavy objects. *Id.* at 205.

Despite the County's contention that disability cannot be established solely by testimony from the plaintiff, Def. Mem. at 7, nothing in the ADA compels that legal conclusion. The County relies on *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35 (5th Cir.1996), in which the Fifth Circuit held that plaintiff's asbestosis was insufficient to establish a substantial limitation on plaintiff's major life functions. But the *Robinson* court did not hold that the failure to present medical testimony compelled reversal; rather,

---

(ii) *shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment* ....
42 U.S.C. § 2000e–5(g)(2)(B) (emphasis added); *see also Pedigo v. P.A.M. Transport, Inc.*, 60 F.3d 1300 (8th Cir.1995) (vacating award of compensatory damages on ADA claim where plaintiff would have been fired even without considering his disability).

5. The specific questions posed to the jury (omitting intermediate instructions) were as follows: Question 1: "Do you find that [plaintiff], at the time he was not promoted, was a qualified individual with a disability?" Question 2: "Do you find that the defendant intentionally discriminated against [plaintiff] on the basis of his disability, that is, was the fact that [plaintiff] was a qualified person with a disability a motivating factor in the defendant's decision not to promote him?" Question 3: "If your answer to question 2 was "Yes," do you find that the defendant has proved by a preponderance of the evidence that the defendant would still not have promoted [plaintiff] for reasons having nothing to do with his disability?" Question 4: "Do you find that, as a direct result of the defendant's intentional discrimination, [plaintiff] sustained compensatory damages?" Question 5(a): "What is the amount of the compensatory damages sustained by [plaintiff] up to the present date as a result of defendant's intentional discrimination?" Question 5(b): "What is the amount of the compensatory damages, if any, that [plaintiff] will sustain in the future as a result of defendant's intentional discrimination?"

plaintiff's "[s]everal instances of shortness of breath when climbing stairs," without more, was insufficient to meet the definition of disability under the ADA. *Id.* at 37. None of the other cases cited by the County stand for the proposition that medical testimony is an absolute prerequisite to a jury finding of disability; instead, they merely require that the plaintiff make some concrete showing of disability. In any event, Dr. Reiss' medical testimony, based on conversations with Colwell and his review of findings by the workers' compensation board, Tr. at 413, corroborates Colwell's testimony, and supports the jury's conclusion that Colwell was disabled at the time he was not promoted.

### (b) Plaintiff Ellinger

■ In 1983, Ellinger suffered a cerebral hemorrhage as the result of a car accident. This resulted in a subarachnoid hemorrhage and hypertension. The continuing effects of this injury have restricted Ellinger's ability to work. Specifically, Ellinger's treating doctor, Dr. Friedling, imposed the following restrictions: "To [only] work days.... [E]ight to four, nine to five only, indoors, avoiding stress and confrontation. Overtime should be restricted to between the hours of eight a.m. and eight p.m. At no time should this patient work late hours or rotating shifts." Tr. at 325 (testimony of Ellinger, referring to letter from Dr. Friedling).

Although Ellinger returned from limited duty to full duty status with the Police Department in December 1992, Tr. at 289, this does not compel a finding of no disability as a matter of law for three reasons. First, despite Ellinger's return to full duty status, Ellinger testified that he continued to follow the physical restrictions recommended by his doctor. Tr. at 330. Second, Ellinger could alternatively have been considered to have a "record of impairment" for purposes of the ADA, which is an independently sufficient basis for a finding of disability. *See* 42 U.S.C. § 12102(2)(B). Finally, the jury could

have reasonably concluded that Ellinger was "regarded" as having an impairment. *See* 42 U.S.C. § 12102(2)(C). In fact, former Police Commissioner Peter Cosgrove ("Cosgrove"), who personally made the promotional decisions at issue in this case, testified that despite Ellinger's return to full duty status, "I assumed [Ellinger] was light duty." Tr. at 726. Any of these grounds could have formed the basis for the jury's conclusion that Ellinger was disabled under the ADA at the time he was passed over for promotion.

### (c) Plaintiff Abrams

■ Abrams suffers from chronic degenerative disc disease. Dr. Donald Holzer ("Dr. Holzer"), Abrams' treating neurologist, described the condition as of the time he was passed over for promotion as an "injur[y] to the cervical and lumbar spine consisting of disc disease with radiculopathy, meaning that he had damage to the nerve roots themselves.... Mr. Abrams was capable of performing some duties of his police work, but certainly not the majority of them." Tr. at 387. As a result of his injury, Abrams was unable to do heavy lifting, could not bend over for long periods, had some difficulty driving, and was unable to sit or stand for an extended period of time. Tr. at 485–87.

The County concedes that Abrams' condition is supported by medical testimony, but argues that this testimony was "nothing more than a boilerplate diagnosis" and that the "A.D.A. standard [substantially limiting a major life activity] was not even mentioned during Dr. Holzer's testimony or during Abrams' testimony." Def. Mem. at 6. This argument is unpersuasive because the jury is charged with assessing the weight and credibility of testimony, and because nothing in the ADA requires testimony that recites the definition of disability word-for-word. Based on the testimony of Abrams and Dr. Holzer, the jury finding that Abrams was disabled is supported by sufficient evidence.[6]

---

**6.** Prior to the commencement of the County's case, the County moved for a mistrial based on a statement made by the Court during the cross-examination of Abrams. Tr. at 611. After counsel for the County had persisted in questioning Abrams as to the cause of his alleged disability,

the Court sustained an objection to that line of questioning on relevancy grounds: "What difference does it make? If he's disabled, he's disabled. I don't care how he's disabled. He could have fallen out of the window for all I care." *Id.* at 519. According to the County, this statement

### 2. Qualified Individual

In order to sustain the jury's verdicts, there must be evidence not only that each plaintiff was disabled at the time of the promotional decisions, but that he was a "qualified individual" with a disability. Under the ADA, a "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[7] As with the disability requirement, the record supports the jury's findings that each plaintiff was a qualified individual.

■ The County relies exclusively on *Santos v. Port Authority,* 1995 WL 431336 (S.D.N.Y.), for the proposition that a plaintiff incapable of vigorous confrontational activities cannot be a qualified individual under the ADA for any position in a police department. In *Santos,* the plaintiff was terminated from his position as a Port Authority police officer. The *Santos* court stressed that a police officer would be required to perform many duties requiring physical exertion, such as patrolling by foot and apprehending violators. *Id.* at *2. By contrast, all three plaintiffs in the present case were seeking promotions to positions requiring far less physical activity. As Cosgrove conceded, police work becomes more sedentary and less physical as one moves up in rank. Tr. at 712. And in a colloquy with the Court at the time the 50(a) motion was initially made, the County conceded that extending the holding of *Santos* to all levels of police work would effectively prevent the applica-

tion of the ADA to any member of a police force:

> THE COURT: If you say that everybody who is on the force has to be able to be involved in confrontational scenarios and if they're not able to do that, then the ADA never can be applicable to them.... Is that what you're contending?
>
> THE COUNTY: Yes, your Honor.
>
> * * * * * *
>
> THE COUNTY: [T]he way I read *Santos* is that all members of the police force have to be able to meet any kind of situation to come before them.
>
> THE COURT: Any kind of situation whatsoever, under any circumstances....?
>
> THE COUNTY: Under the ADA.
>
> * * * * * *
>
> THE COUNTY: [T]he question is whether the police department is required, under the ADA, to accommodate and in that way I would argue that under *Santos* they're not required to accommodate.
>
> THE COURT: *Santos* deals with a police officer. Maybe if we were dealing with police officers, I would have a different view of this because it's common sense that a foot patrolman, a police officer, is a line officer. He has to be there, or she has to be there, ready to do battle, so to speak, at any time. It's a common sense type of understanding. But we're not dealing with police officers in that context here. It seems we have a different type of thing.

---

was "severely prejudicial to the County['s] position." *Id.* at 612. But when asked by the Court: "It doesn't matter how somebody becomes disabled as long as they are disabled within the ... ADA.... Do you agree with that proposition?" the County replied: "I agree with that proposition." *Id.* at 612–13. The motion was accordingly denied. *Id.*

7. The Court tailored its "qualified individual" jury charge to the Second Circuit's opinion in *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131 (2d Cir.1995), and, in particular that decision's instruction as to how a district court judge in the Second Circuit is to address the issue of reasonable accommodation and the parties' respective burdens of proof and production. Accordingly, the Court instructed the jury that if the plaintiff

failed to prove that he was a qualified individual without the need for accommodation:

> [T]hen he must prove by the preponderance of the evidence that he can be accommodated with his disability, *and produce evidence to suggest that such an accommodation would be reasonable. In this latter regard, the plaintiff's burden is not heavy; it is enough for the plaintiff to suggest the existence of a plausible accommodation.* If the plaintiff satisfies these dual aspects of reasonable accommodation, the burden then shifts to the defendant to prove by the preponderance of the evidence that the proposed accommodation was not reasonable.

(Emphasis added); *see Borkowski,* 63 F.3d at 138.

Tr. at 579, 581, 583. Thus, even if *Santos* was binding authority, which it is not, it is readily distinguishable from the facts of the present case.

Plaintiffs offered ample evidence to support a jury finding that all three plaintiffs were qualified to perform the essential functions of the positions for which they sought promotion. This evidence came both from testimony given by the plaintiffs and from recommendations from the plaintiffs' superiors.

#### (a) *Plaintiff Colwell*

A recommendation from Colwell's supervisor states, *inter alia,* that "[a]lthough Lieutenant Colwell is light duty due to a back injury which occurred in 1984, I do not feel that this would hinder him in handling the duties common to the position of captain." Tr. at 218; Pl. Exh. 15. Colwell testified that he was familiar with the duties of the approximately twenty captain positions, and stated that any of those positions could be performed by someone with his physical condition. Tr. at 233–34. This evidence was sufficient to support a finding that Colwell was a "qualified individual" at the time he was denied promotion.

#### (b) *Plaintiff Ellinger*

Ellinger returned to full duty status in December of 1992, indicating his physical ability to perform the essential functions of a Lieutenant. Tr. at 288–89. Furthermore, Ellinger testified that he was familiar with the requirements of the Lieutenant position, and that he was capable of performing Lieutenant duties. Tr. at 337, 349, 352. There is, therefore, an evidentiary basis to support the jury's finding that Ellinger was a "qualified individual" at the time he was not promoted.

#### (c) *Plaintiff Abrams*

Like Colwell, Abrams received a recommendation clearly stating that he was able to perform the essential functions of the position he sought: "In conclusion, while true [that Abrams] does suffer from a line of duty back injury, it is my opinion that he can and will perform exceptionally in the capacity of lieutenant." Tr. at 497 (evaluation by Deputy Inspector Dominic Steo). Furthermore, Abrams testified that while holding the position of Sergeant, he served as Lieutenant on over 100 occasions when his supervisor was not present, and that through these experiences he became very familiar with the duties of Lieutenant. Tr. at 467, 500–02. Based on his experience, he stated that he was "definitely" capable of performing as Lieutenant despite his physical condition. Tr. at 501. Accordingly, there was sufficient evidence to support the jury's finding that Abrams was a qualified individual at the time he was passed over for promotion.

### 3. *Intentional Discrimination*

The New York State Constitution provides that "promotions in the civil service of the state and all of the civil divisions thereof . . . shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive. . . ." N.Y. Const. art. V, § 6. In accordance with this constitutional directive, New York Civil Service Law § 61(1) provides, in pertinent part, that "promotion from an eligible list . . . shall be made by the selection of one of the three persons certified by the appropriate civil service list as standing highest on such eligible list." *See also Professional, Clerical, Technical Employees Assoc. v. Buffalo Bd. of Educ.,* —— A.D.2d ——, 653 N.Y.S.2d 743, 743 (4th Dep't 1997) ("the one in three rule is based upon the public policy that the appointing authority must be cloaked with the power to choose a qualified appointee who possesses all the attributes necessary for the responsible performance of his duties") (internal quotation omitted). The one-in-three rule, therefore, places a restraint on the County by requiring that it promote one of the top three candidates for each position, while simultaneously providing the County some measure of flexibility by not granting any particular candidate an absolute entitlement to a position. *See Suarez v. Ward,* 896 F.2d 28, 29 (2d Cir.1990) ("[The one-in-three rule] reflects a balance between the policy of maintaining merit systems for public employees

and the need of administrators to exercise control over the composition of their staffs.").

The Court must examine the sufficiency of the evidence in respect to the two jury findings relating to intentional discrimination: (1) that for each plaintiff, disability was a motivating factor in the decision not to promote him, and (2) that for each plaintiff, the County failed to prove that regardless of his disability, he would not have been promoted. The County maintains that the decisions not to promote plaintiffs were based on objective standards applied to promotions from civil service lists and hence there was no intentional discrimination. Def. Mem. at 14–18. However, the record contains sufficient evidence to support the jury's findings on these two interrelated discrimination issues.

### (a) Plaintiff Colwell

■ At the time he was not promoted, Colwell was tied for sixth place on the applicable civil service list for promotion to Captain. Tr. at 211. The County promoted six from the list, choosing to promote the person tied with Colwell for the sixth position, James Rhoads ("Rhoads"). The County contends that the decision to promote Rhoads instead of Colwell was based solely on a traditional seniority tie-breaking practice. Def. Mem. at 16 (the tie-breaker "clearly provides a rational basis for its decision"). The County argues that the tie-breaker (1) defeats the possibility of a finding that disability was a motivating factor in the promotional decision, and (2) in any event requires a finding as a matter of law that Colwell would not have received a promotion even if disability was not taken into account.

Despite the simplistic appeal of the seniority tie-breaker argument, there was sufficient evidence offered at trial to support a finding that disability was a motivating factor in the promotional decision, and, in particular, that Cosgrove intended to depart from the traditional rules concerning promotion and to prevent persons on light duty from receiving promotions. Thus, although Cosgrove testified that in regard to Colwell he was simply "applying the traditional type of method," Tr. at 673, Cosgrove later testified that in regard

to other candidates, he did not feel bound by the traditional tie-breaking practice:

PLAINTIFF: But you established that the Department has this time-honored method of separating the ties?

COSGROVE: Yes, and I broke with that. But I did not use a Civil Service method [to break ties]. There is no Civil Service method.

PLAINTIFF: Exactly.... So instead of going with the time-honored tradition, you broke with the time-honored tradition and went to [the next candidate] ... and promoted him?

COSGROVE: Yes.

Tr. at 735–36.

Furthermore, Cosgrove testified that he met with Chief Monteith ("Monteith") and other supervisors concerning promotion policy and light duty personnel. Tr. at 729. Minutes of this meeting include the following statements: "The names of potential promotees will be sent to division chiefs for evaluation. Take a close look at light duty personnel." Pl. Exh. 37; Tr. at 235. This meeting resulted in the issuance by Monteith of a memorandum directing potential promotees to report for a physical examination. Pl. Exh. 7. Colwell testified that he perceived the memorandum as being targeted to light duty personnel, and feared that his light duty status might impinge on his chance for promotion. Tr. at 226–27. Colwell met with Cosgrove to express his concern that his light duty status was being taken into account. *Id.* at 227. Colwell testified that in that meeting, Cosgrove told him that: "I'm promoting three just as it came from personnel. I can't promote you anyway because of your light duty status." *Id.* at 229. And Ellinger testified that during a conversation with Cosgrove, Cosgrove told him that he was not going to promote any candidates who were on light duty. *Id.* at 318. The jury was entitled to credit Colwell's and Ellinger's testimony and to discredit Cosgrove's explanation that he merely used the "time-honored" tradition to break the tie between Colwell and Rhoads. *Id.* at 737. This evidence supports the jury's finding that disability was a motivating factor in Cosgrove's decision.

The Court must further determine whether the evidence was sufficient to support the jury's finding that the County failed to prove by a preponderance of the evidence that Colwell still would not have been promoted to Captain for reasons having nothing to do with his disability. Colwell's primary argument at trial was that he would have been promoted had his disability not been considered because the County had a tradition of promoting all "ties." Tr. at 236–37. In other words, where two people were tied for the last position on the civil service list from which a promotion was to be made, the County allegedly would promote both by appointing one of the two to an interim position. The Court rejected this position, and instructed the jury that, as a matter of law, promotion of Colwell to an interim position could not be considered as a reasonable accommodation in deciding whether Colwell was a "qualified individual." [8]

Nevertheless, the burden of proof on this issue rested with the County, and based on the evidence presented at trial, the Court cannot say that a reasonable jury only could have found that Colwell would not have been promoted. There was testimony from Colwell to support the notion that Colwell would have been chosen over Rhoads had disability not been taken into consideration. Specifically, Colwell testified that he had earned more awards than Rhoads, and that even though Rhoads had more experience at the Lieutenant level than Colwell, Colwell had more experience at the Sergeant level, and more experience working in the precinct. Tr. at 241–42, 249–50. Although the County offered testimony that seniority was the traditional tie-breaker, Cosgrove's testimony that he did not feel bound by the traditional rules could have been taken into consideration by the jury as it weighed the evidence.

Viewing the evidence in the light most favorable to the non-movant, the Court determines that there was sufficient evidence to support the jury's finding that Colwell's disability was a motivating factor in the County's decision not to promote him, and that the jury could conclude that the County failed to prove by a preponderance of the evidence that Colwell still would not have received the promotion for reasons having nothing to do with his disability.

*(b) Plaintiffs Abrams and Ellinger*

■ The evidence at trial clearly supports the conclusion that disability was a factor in Cosgrove's decisions bypassing Abrams and Ellinger. At the time he was passed over for promotion, Abrams ranked first on the list for promotion to Lieutenant. Tr. at 489. Ultimately, seven people below Abrams were promoted to Lieutenant. *Id.* at 490. Ellinger was ranked third on that same list. *Id.* at 310. Abrams testified that in his almost twenty years of experience with the police force he had never known of such a bypass, except in cases where candidates had prior disciplinary problems. *Id.* at 491. There is nothing in the record to suggest that any of the plaintiffs had disciplinary problems. In addition, Sergeant Vincent Ward, who is employed by the Police Department's medical evaluations unit, testified that, as with Colwell, he was ordered by his superiors to prepare medical reports specifically on Ellinger and Abrams. *Id.* at 539. This collective evidence is sufficient, especially in conjunction with Ellinger's and Colwell's testimony that Cosgrove told each of them that he would not promote light duty candidates, to support a finding that disability was a factor in the decisions not to promote Abrams and Ellinger.

There was also sufficient evidence to support the finding that the County failed to prove that, even if disability was not taken into account, Abrams and Ellinger still would have been passed over for promotion. Although ranking high on the civil service list

**8.** The Court based this instruction on testimony from Cosgrove that interim positions were only created by the County legislature. This would occur when, during the course of a year, the County determined that an additional position, not yet budgeted, was needed. Although it would be uncertain whether the County would fund the position, the Police Department would be authorized under such circumstance to appoint someone to an interim position. Tr. at 741–43. Since there was no evidence that such an interim Captain position existed at the time Colwell was denied promotion, the jury was instructed that it could not consider the possibility of an interim position appointment with respect to Colwell.

does not create an absolute entitlement to any particular position, *see Aladin v. Schultz*, 176 A.D.2d 205, 206, 574 N.Y.S.2d 326 (1st Dep't 1991), the lack of evidence that anything other than disability played a role in the County's decision supports the reasonableness of the jury's finding that the County failed to meet its burden of proving that Abrams and Ellinger would still not have received the promotion.

Accordingly, the Court will not disturb the jury's specific findings with regard to each of the plaintiffs that disability was a motivating factor in the denials of promotion, and that the County did not sustain its burden of proof that they would not otherwise have been promoted.

## II. REMEDIAL ISSUES

On April 24, 1997, the Court held a post-verdict hearing ("Hearing") on all issues pertaining to damages and equitable relief. The Court sought input from the parties on plaintiffs' requests for back pay, promotion and future compensatory damages to assist the Court in formulating an appropriate judgment.

The remedial section of the ADA explicitly incorporates those remedies authorized by Title VII. 42 U.S.C. § 12117 (incorporating 42 U.S.C. §§ 2000e–4, 2000e–5, 2000e–6, 2000e–8 and 2000e–9). In determining the appropriate set of remedies, the Court is guided by the "make whole" concept which lies at the heart of these remedies. *See Landgraf v. USI Film Products*, 511 U.S. 244, 254, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229 (1994) (making plaintiff whole is a "central statutory purpose" of Title VII) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975)).

More than two decades ago, the Supreme Court in *Albemarle Paper* thoroughly examined the legislative history of the "make whole" concept underlying Title VII's remedial scheme, concluding that "Congress' purpose in vesting a variety of 'discretionary' powers in the courts was ... to make possible the 'fashion(ing) (of) the most complete relief possible.'" 422 U.S. at 421, 95 S.Ct. at 2373 (quoting 118 Cong. Rec. 7168 (1972)).

One year after *Albemarle Paper* was decided, the Supreme Court clarified that the "make whole" concept "requires that persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for the unlawful discrimination." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (noting further that the "make whole" requirement "vest[s] broad equitable discretion in the federal courts"). The Second Circuit has consistently emphasized that district courts have broad discretion to fashion a wide range of remedies in employment discrimination cases. *See Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727–28 (2d Cir.1984) (holding that front pay award is appropriate to make plaintiff whole in age discrimination case); *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125 (2d Cir.1996) (same), *cert. denied*, —— U.S. ——, 117 S.Ct. 2453, —— L.Ed.2d —— (1997); *Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir.1994) (holding that back pay award was necessary to make plaintiff whole in Rehabilitation Act case); *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 288 (2d Cir.1981) ("there can be no doubt that the award of back pay is central to the 'make whole' purpose of Title VII"); *Berkman v. City of New York*, 705 F.2d 584, 595 (2d Cir.1983) ("[c]ompensatory relief is designed to 'make whole' the victim of defendant's discrimination" under Title VII). The Court therefore proceeds to fashion remedies necessary to make plaintiffs whole.

### A. Back Pay

Title VII and, perforce, the ADA authorize the Court to determine and award back pay to compensate plaintiffs for the increase in pay each would have received had he obtained the promotion that the jury found was wrongfully denied. *See* 42 U.S.C. § 2000e–5(g)(1) (Title VII section authorizing back pay). At the Hearing, the parties stipulated to the proper amount of back pay for each plaintiff, which was calculated from the date each plaintiff was denied promotion to the date of the jury verdict. It was agreed that

this sum was $23,269.70 for Colwell, and $31,378.50 each for Abrams and Ellinger. Hr'g at 3–5.

## B. Promotion/Front Pay

 Consistent with the "make whole" policy underlying the ADA, plaintiffs ask the Court to promote them to the positions the jury found they were wrongfully denied. Hr'g at 7. Until such promotions materialize, each plaintiff also seeks "front pay," which here means the wage differential between his current position and the position which he was denied.[9] The ADA clearly permits a Court to combine promotion and front pay as equitable remedies. *See* 42 U.S.C. § 2000e–5(g)(1) (authorizing court to "order such affirmative action as may be appropriate, which may include ... reinstatement or hiring ... or any other equitable relief as the court deems appropriate").

The Court has reflected on three possible resolutions to the promotion/front pay issue: (1) it could order the County to promote each plaintiff immediately; (2) it could order the County to promote each plaintiff to the next available position, with front pay to the date of promotion or without front pay; or (3) it could choose, if appropriate, never to promote plaintiffs and order front pay as the sole remedy. *See generally Whittlesey v. Union Carbide Corp.,* 742 F.2d 724 (2d Cir. 1984).

As for the first option, the Court will not create a new police position to which plaintiffs could be promoted since the creation of police positions is the province of the legislative branch. *See* New York County Law § 204 (authorizing county boards of supervisors to create positions of employment). Nor will the Court promote plaintiffs in the absence of a vacancy by "bumping" present

employees. Such a result would be harsh to those who have undoubtedly grown dependent on their employment and would suffer if suddenly uprooted from their positions. Indeed, counsel for the plaintiffs agreed at the Hearing that the Court should wait for a vacancy to arise before requiring promotion. *Id.* at 14.

At the other extreme, to never promote plaintiffs would defeat the "make whole" policy of the ADA. The County, nonetheless, argued at the Hearing that the Court does not have the power to order the County to promote the plaintiffs to the next available positions [10] because doing so would preclude qualified employees from obtaining promotions they otherwise would receive. Counsel for the County conceded at the Hearing that, under their proffered rationale, no plaintiff working for the County could ever receive a promotion as a remedy under the ADA:

> THE COUNTY: [T]hey are encumbered by a civil service list, and for you to do that would be creating some form of federal bump-and-retreat rights for these plaintiffs, which will then result in of course additional lawsuits against the County by the people who are bumped out of position.

> THE COURT: Maybe yes, maybe no. But you see, if I follow your line of reasoning, that means these people can never, ever, nor anybody else similarly situated, get these positions, which they've been denied, according to the jury determination, promotion to. There's something about that, I'm sure you would agree, that's unsettling from the jurist's point of view that's trying to create a fair remedy here.

---

9. Although the statutory language authorizing compensatory damages includes "future pecuniary losses," 42 U.S.C. § 1981a(b)(3), suggesting on its face that future lost wages should be determined by the jury, courts have nevertheless held that front pay, as distinct from compensatory damages for future harm (*e.g.,* future pain and suffering), is an equitable remedy for the Court to determine. *See Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 n. 7 (2d Cir.1996) ("The award of front pay lies within the discretion of the district court."); *Benson v. Northwest Air-*

*lines, Inc.,* 1997 WL 122897 (D.Minn. March 18, 1997) (in ADA case, "the court concludes that any award of front pay is properly classified as 'other equitable relief' under § 2000e–5(g) rather than damages for 'future pecuniary losses' under § 1981a.").

10. Counsel for the County stated at the Hearing that "I am relatively assured that there will be openings at some time...." Hr'g at 9.

But that is the logical extension to your argument, is it not?

THE COUNTY: I absolutely agree with that, Your Honor.

Hr'g at 11. Moreover, although the Second Circuit has recognized that there are circumstances where front pay should be the sole remedy—*e.g.*, where there is lingering hostility between the defendant employer and the plaintiff, *see Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125–26 (2d Cir. 1996)—there has been no evidence presented, nor contention made by any party, that there are any reasons why plaintiffs would not be able to work peacefully in the positions they seek.

The Court determines that the appropriate remedy to make plaintiffs whole in respect to promotion and front pay is to order the County to promote each plaintiff to the next available position and to make weekly front pay awards to each plaintiff until he is promoted. Thus, the County shall appoint Colwell to the next vacant Captain position, Abrams to the next Lieutenant position, and Ellinger to the next Lieutenant position after Abrams is promoted.[11]

In *Lander v. Lujan*, 888 F.2d 153 (D.C.Cir. 1989), then-Judge Ruth Bader Ginsburg, in a concurring opinion in a Title VII case, appropriately referred to the award of front pay until the next available promotion as the "rightful place" approach because it avoided any unfairness resulting from "bumping" an incumbent out of a position when the Court orders the defendant to immediately promote the plaintiff. *Lander*, 888 F.2d at 159 (Ginsburg, J., concurring). Furthermore, it is more likely that a person currently holding a particular position has a protected interest in the position than a person who is a mere candidate for a future position. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (explaining nature of constitutionally protected interest in employment); *Todaro v. Norat*, 112 F.3d 598, 600

(2d Cir.1997). This is particularly true here, since the one-in-three rule does not grant any candidate an absolute entitlement to any particular position. *See Aladin v. Schultz*, 176 A.D.2d 205, 206, 574 N.Y.S.2d 326 (1st Dep't 1991) ("[plaintiffs] had no vested right, by reason of their positions on the eligibility list, to permanent promotional appointments from that list").

Moreover, there is nothing unfair about bypassing the person who would receive the next promotion because, as the jury found, each plaintiff was entitled to receive the promotion he sought and would have received that promotion if his disability had not been taken into account. In other words, someone was promoted who should not have been promoted. The Court has discretion to balance the equities and determine that this type of "bumping" is necessary to fashion an appropriate set of remedies. *See Shea v. Icelandair*, 925 F.Supp. 1014, 1031 (S.D.N.Y. 1996) ("Even those courts that have subscribed to the 'no bumping' rule have made an exception where the equities in a particular case warrant it.").

 The County also argued at the Hearing that the Court should not order any of the plaintiffs to be promoted to the next available position because the next vacancy may turn out to be one which the plaintiff could not perform because of his disability, *e.g.*, a position involving a high risk of physical confrontation, and because the County would have to "shuffle," or reassign, personnel to accommodate plaintiffs' disabilities. Hr'g at 22. Moreover, the County contends that any reshuffling of assignments would violate its collective bargaining agreement.[12] *Id.* The Court rejects each of these contentions for two reasons. First, the County's arguments are premised on a conclusion that the jury explicitly rejected: that the plaintiffs are incapable of performing the essential functions of the positions they seek. Second,

---

11. The parties stipulated at the Hearing that, if they are to be promoted, Abrams should be promoted before Ellinger, based on their respective positions on the civil service list. Hr'g at 8.

12. The County never explained at the Hearing why Court-ordered promotions would violate its

collective bargaining agreement, other than its comment that "[i]t would be an arbitrary reassignment." Hr'g at 22. In any event, a collective bargaining agreement cannot serve to undercut the rights and remedies federal law affords plaintiffs under the ADA.

there was testimony at trial from Cosgrove that employees have been "shuffled" at various times, and that the duty assignment system is designed to be flexible:

> THE COUNTY: [W]hat about the functions of the vacancies, how would they be filled by the department?
>
> COSGROVE: Well, you would try to plug the hole as best you could, depending upon what rank it was in, you would shuffle people around, picking people from let's say less essential functions to more essential functions.
>
> \* \* \* \* \* \*
>
> THE COUNTY: [W]hen the vacancy would occur in the lieutenant's position, and again we're focusing on the period of about 1992 to 1993, how would the department cover that vacant position?
>
> COSGROVE: Again, we would shuffle people around from less essential to more essential.

Tr. at 645–46. This point was emphasized by the plaintiffs during the cross-examination of Cosgrove:

> PLAINTIFFS: It sounds like the appointments of personnel in the Suffolk County Police Department is very fluid.... You can promote people, you can transfer people. Is that correct?
>
> COSGROVE: Yes.
>
> \* \* \* \* \* \*
>
> PLAINTIFFS: Back in that period of time, early '93, there was no restrictions as far as you saying okay, we're going to move this lieutenant from position A and move him over to position B, and we're going to take sergeant X and move him up into lieutenant A's position, correct?
>
> COSGROVE: Correct. That's an internal decision.

Tr. at 688–89.

Therefore, until each plaintiff receives his promotion, the County is ordered to make a weekly front pay award representing the difference between each plaintiff's salary and the salary paid for the position to which each plaintiff should have been promoted.

**C. Past Compensatory Damages**

 In accordance with 42 U.S.C. § 1981a(b), the jury was instructed that it could award past compensatory damages for emotional pain and suffering, inconvenience, and mental anguish suffered by the plaintiffs from the time they learned of the promotional decisions to the date of the verdict. Although the issue may be revisited in a subsequent Rule 59 motion, should that be the County's bent, the Court notes in passing that the jury's past compensatory damages verdict was clearly not excessive. Each of the plaintiffs testified as to the effects of his non-promotion: loss of self-esteem, frustration tied to hundreds of hours spent studying for the civil service exam, the deleterious effects of non-promotion on his career aspirations, strain placed on his family life, and loss of respect from his colleagues and subordinates. Tr. at 237–40 (Colwell), 332–37 (Ellinger), and 504–07 (Abrams). The jury's verdicts on past compensatory damages were supported by sufficient evidence and did not "shock the judicial conscience and constitute a denial of justice," the standard by which excessiveness is to be measured. *See Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996).

**D. Future Compensatory Damages**

 In addition to past compensatory damages, the Court separately permitted the jury to award future compensatory damages. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 247, 114 S.Ct. 1483, 1487–88, 128 L.Ed.2d 229 (1994) (noting that Civil Rights Act of 1991 provides for right to jury determination of compensatory damages); *Dailey v. Societe Generale*, 889 F.Supp. 108, 112 n. 3 (S.D.N.Y.1995) (stating that under Title VII, back pay and front pay are for the court to determine, while compensatory damages are for the jury). In doing so, the Court instructed the jury to assume that each plaintiff would never get the promotion he sought. The Court also informed the jury about the age of each plaintiff,[13] the life expectancy for

---

13. The parties stipulated that, at the time of the jury charge, Colwell was 52 years old, Ellinger was 48 years old, and Abrams was 47 years old.

each plaintiff,[14] and the average number of subsequent years in the labor force based on age.[15] The Court separated future from past compensatory damages because it believed that future compensatory damages would plausibly be dependent on its post-verdict determinations in respect to front pay and/or promotion, and the timing of any promotion. *See Padilla,* 92 F.3d at 125–26. Obviously, the jury's future compensatory damage awards would have been affected if it could have known if and when promotions and/or front pay would occur since knowledge by plaintiffs that relief would be in sight would undoubtedly have assuaged their ongoing anxiety and mental anguish.

Therefore, the Court believes that since it is requiring promotions to the next available positions and front pay until that time, it must use its equitable powers and modify the jury's future compensatory damage awards, which, by necessity, were rendered at a time prior to the Court's fashioning of post-verdict remedies. In doing so, the Court seeks to preserve the jury's province to determine compensatory damages while simultaneously upholding its responsibility to fashion a rational judgment. *See, e.g., Bridges v. Eastman Kodak Co.,* 102 F.3d 56 (2d Cir.1996) (affirming Title VII judgment in which district court declined to award back pay to avoid double recovery); *Conway v. Icahn & Co.,* 16 F.3d 504, 511 (2d Cir.1994) (affirming district court's adjustment of jury award to prevent double recovery). Indeed, counsel for both parties recognized that, should the Court award promotions and/or front pay, such an adjustment was warranted, and further agreed that the jury's determination could be modified by breaking down the award into weekly payments to be made to plaintiffs until they are promoted. *See* Hr'g at 18–21.

The Court accordingly has calculated the weekly future compensatory damage awards. For each plaintiff, the Court subtracted the plaintiff's age from the agreed-upon retirement age of 62 years, then multiplied the number of remaining years by 52 weeks, and then divided that number into $150,000. Thus, Colwell will receive as future compensatory damages $288.46 per week until he is promoted, Ellinger will receive $206.04 per week until he is promoted, and Abrams will receive $192.31 per week until he is promoted.[16]

■ In calculating the weekly future compensatory damage awards, the Court determines that the $150,000 verdicts are supported by the evidence presented at trial and are not excessive.[17] The evidence before the jury concerned emotional pain, inconvenience, and mental anguish in the past and future. Plaintiffs' lost self-esteem, hindered career advancement opportunities, and strained family life are concerns which project into the future. The jury was therefore entitled to determine that these damages were of an ongoing nature, and to award each plaintiff $150,000 to compensate for that

**14.** Based on the life expectancy table utilized by the Court, the jury was told that the life expectancy for a 52 year-old male is 76.7 years, for a 48 year-old male is 76.1 years, and for a 47 year-old male is 75.9 years. New York Pattern Jury Instructions, Table 1.

**15.** The jury was told that, according to the same table, a 52 year-old has 10.8 more active years in the labor force, a 48 year-old has 13.9 more years, and a 47 year-old has more 14.7 years. *Id.*

**16.** The Court did not charge the jury on discounting the future compensatory damage awards since neither party requested such a charge. The Court reminded the parties of this during the Hearing, and neither party took issue with this decision. Hr'g at 6; *see also Ramirez v. New York City Off–Track Betting Corp.,* 112 F.3d 38, 42 n. 5 (2d Cir.1997) (dictum) (noting that defendants failure to preserve the discounting

issue prevented review of charging decision). In any event, remand for discounting purposes would, under the circumstances, serve no useful purpose, *see Oliveri v. Delta S.S. Lines, Inc.,* 849 F.2d 742, 752 (2d Cir.1988), and indeed would be inappropriate in light of the need for the Court to modify the future compensatory damage awards.

**17.** Although there is no Rule 59 motion for a new trial claiming that the verdict was excessive presently before the Court, it would be inappropriate for the Court to adjust the future compensatory damage awards based on the possibility of promotion if the verdicts themselves were excessive. As previously indicated, however, the County is not barred from making a Rule 59 motion should it wish to challenge the size of the compensatory damage awards.

future harm. The reasonableness of the sum selected by the jury is made clear by comparing the $150,000 figure, which is intended to cover a time span of at least ten to fifteen years,[18] with the past compensatory damage awards of $65,683 and $70,636, which compensate plaintiffs for harm which occurred over a span of approximately four years.[19]

### E. Interest

 In order to complete the process of making plaintiffs whole, the Court will award prejudgment interest on the stipulated back pay awards and the past compensatory damage awards from the date of the verdict to the date of judgment. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144 (2d Cir.1993) (district court has discretion to award prejudgment interest in Title VII case). In accordance with other district courts in this Circuit, the Court will direct the Clerk to calculate this prejudgment interest based on the United States 52–week treasury bill rate referred to in 28 U.S.C. § 1961, rather than New York State's statutory rate of 9%. *See Greenway v. Buffalo Hilton Hotel*, 951 F.Supp. 1039, 1062–63 (W.D.N.Y.1997); *Luciano v. Olsten Corp.*, 912 F.Supp. 663, 676–77 (E.D.N.Y.1996).

### CONCLUSION

For the foregoing reasons, the County's motion for judgment as a matter of law is denied, and judgment shall be entered as follows:

1. The County shall award the first vacant Captain position to plaintiff Robert N. Colwell, and shall pay him: (a) $23,269.70 in back pay; (b) $70,636.00 in past compensatory damages; (c) weekly payments of $288.46 in future compensatory damages, without interest, from the date of the verdict until Colwell receives a promotion to Captain; and (d) a weekly front pay award, without interest, from the date of the verdict until Colwell

receives a promotion to Captain, based on the differential, from time to time, between Colwell's salary as Lieutenant and the salary he would receive as Captain;

2. The County shall award the first vacant Lieutenant position after Abrams is promoted to plaintiff Charles R. Ellinger, and shall pay Ellinger: (a) $31,378.50 in back pay; (b) $65,683.00 in past compensatory damages; (c) weekly payments of $206.04 in future compensatory damages, without interest, from the date of the verdict until Ellinger receives a promotion to Lieutenant; and (d) a weekly front pay award, without interest, from the date of the verdict until Ellinger receives a promotion to Lieutenant, based on the differential, from time to time, between Ellinger's salary as Sergeant and the salary he would receive as Lieutenant;

3. The County shall award the first vacant Lieutenant position to plaintiff Richard H. Abrams, and shall pay him: (a) $31,378.50 in back pay; (b) $65,683.00 in past compensatory damages; (c) weekly payments of $192.31 in future compensatory damages, without interest, from the date of the verdict until Abrams receives a promotion to Lieutenant; and (d) a weekly front pay award, without interest, from the date of the verdict until Abrams receives a promotion to Lieutenant, based on the differential, from time to time, between Abrams' salary and the salary he would receive as Lieutenant;

4. The County shall pay each plaintiff an amount corresponding to the prejudgment interest that has accrued from the date of the verdict to the date of the judgment on the back pay and past compensatory damage awards; this calculation shall be made by the Clerk of the Court in accordance with 28 U.S.C. § 1961;

5. The Court retains jurisdiction should any dispute arise regarding the date of plaintiffs' appointments to the first available va-

---

18. The jury could reasonably have based its future compensatory damage award on the harm each plaintiff will suffer for the rest of his life rather than on the harm each will suffer until his probable age of retirement.

19. The Court believes that it is for the jury to determine future compensatory damages. How-

ever, even if this issue was, as with front pay, deemed to be for the Court to determine, the Court would have considered the jury's award to be advisory, and would have reached the same result by making findings of fact consistent with the above-mentioned evidence of plaintiffs' future pain and suffering.

cancies, and the appropriate calculations of future compensatory damages and front pay.

**SO ORDERED.**