UNITED STATES of America for the Use and Benefit of MARIS EQUIPMENT COMPANY, INC., Plaintiff,

v.

MORGANTI, INC. and Trataros Construction, Inc. d/b/a Morganti / Trataros Joint Venture, American Home Assurance Company and Seaboard Surety Company, Defendants.

Morganti, Inc. and Trataros Construction, Inc. d/b/a Morganti / Trataros Joint Venture, American Home Assurance Company and Seaboard Surety Company, Plaintiffs,

v.

Liberty Bond Services, Inc., Defendant.

United States of America for the use and benefit of Industrial Acoustics Company, Inc., Plaintiff,

v.

Maris Equipment Company, Inc., Maris Equipment Company, Inc., Insurance Company of North America and Liberty Mutual Insurance Company, Defendants

Maris Equipment Company, Inc., Third–Party Plaintiff,

v.

Morganti, Inc. and Trataros Construction, Inc. d/b/a Morganti / Trataros Joint Venture, American Home Assurance Company and Seaboard Surety Company, Third–Party Defendants

Nos. 96–CV–2205(FB), 96–CV–2854(FB), 97–CV–1543(FB).

United States District Court, E.D. New York.

Sept. 20, 2001.

Hartford, CT, for Morganti, Inc. and Trataros Construction, Inc. d/b/a Morganti / Trataros Joint Venture, American Home Assurance Company and Seaboard Surety Company.

Michael Torre, Esq., Kevin M. Gary, Esq., Tunstead, Schechter & Torre, Jericho, NY, for Maris Equipment Company, Inc.

Louis R. Pepe, Esq., Timothy T. Corey, Esq., Richard F. Wareing, Esq., Wendy S. Kennedy, Esq., Pepe & Hazard LLP,

Mark Gamell, Esq., Stockman Wallach Lentz & Gamell, LLP, New York City, for Liberty Bond Services, Inc.

### *DECISION AND ORDER*

BLOCK, District Judge.

## TABLE OF CONTENTS

INTRODUCTION ...................................................177

I. General Overview of the Litigation ........................................178

II. Morganti's Rule 50(b) Motion ...............................................180
 A. Standard ...............................................180
 B. Liability Issues ...............................................181
 1. *The Government's Complicity* ...............................181
 2. *Waiver* ...............................................185
 C. Damage Issues ...............................................185
 1. *The Government's Complicity* ...............................185
 2. *Profit and Overhead* ...............................................187
 *Profit* ...............................................188
 *Overhead* ...............................................191

III. Morganti's Rule 59(a) Motion ...............................................192
 A. Standard ...............................................192
 B. Morganti's Claims Against Liberty ...............................................193
 1. *Breach of Obligation Under the Bond* ...............................193
 2. *Covenant of Good Faith and Fair Dealing* ...............................195
 3. *Tortious Interference With Contract* ...............................195
 4. *Tortious Interference With Business Relations* ...............................196
 C. The Jury Instructions ...............................................196
 1. *The Liability Charge* ...............................................196
 2. *The Damage Charge* ...............................................197
 D. The Court's Management of the Trial ...............................................198

IV. Maris's Rule 50(b) Motion ...............................................198
 A. The Release ...............................................199
 B. Preclusion of Pre–January 1995 Costs ...............................................200

V. Prejudgment Interest ...............................................202

CONCLUSION ...............................................202

## INTRODUCTION

This litigation arose out of the construction of the new federal detention center in Brooklyn, New York ("Project"). Morganti/Trataros Joint Venture ("Morganti"), the Project's general contractor, and Maris

Equipment Company, Inc. ("Maris"), a subcontractor, each claimed that the other had breached their contract.[1] On July 7, 2000, following a four-week trial, bifurcated between liability and damages, a jury returned a verdict for Maris in the sum of $8,001,249.[2] Pending before the Court are Morganti's Rule 50(b) and 59(a) motions raising a host of issues, as well as a Rule 50(b) motion by Maris challenging an adverse ruling on one of its damage claims. The Court must also rule on two reserved issues—whether Maris established its entitlement to profit and overhead as component parts of the damage award; a stipulated issue of law regarding the application of a certain release, and Maris's request for prejudgment interest. For simplicity of presentation, the Court will address the reserved damage issues in the context of Morganti's Rule 50(b) motion, and will address the release issue under Maris's Rule 50(b) motion since it is inextricably intertwined with the damage claim raised by Maris in that motion.[3]

## I. General Overview of the Litigation

The Project called for the construction of a nine-story, thousand-cell facility at a cost of approximately $103,000,000. The agency in charge of the construction on behalf of the federal government was the Federal Bureau of Prisons ("FBOP"). In 1993, the FBOP chose Morganti as the general contractor. Morganti thereafter entered into a subcontract with Maris, dated September 28, 1993 ("Subcontract"), to fabricate and install the cells. The Subcontract price was $12,725,000 and required Maris to obtain a performance bond. Maris bonded with Liberty Bond Services, Inc. ("Liberty").

Work on the Project was hampered by a series of delays, primarily due to the government's faulty design; consequently, Maris experienced financial strains, which jeopardized its performance. Pursuant to an agreement between Maris and Liberty made in June 1995, Liberty provided financial assistance. It also hired Surety & Construction Consultants ("SCC"), a consulting engineering firm, to monitor Maris's work. Based on reports from SCC that Morganti was mismanaging the Project and not honoring its payment obligations to Maris, Liberty concluded that Morganti had breached the Subcontract and terminated funding Maris's performance. On May 3, 1996, at Liberty's behest, Maris declared Morganti to be in default and walked off the job. These three litigations ensued.

Maris struck first, initiating Action # 1 on the same day it declared Morganti to be in breach. In this litigation, Maris sued Morganti and its sureties, defendants American Home Assurance Company and Seaboard Surety Company, under the Mil-

1. Morganti/Trataros Joint Venture was dissolved on April 2, 1996 pursuant to a dissolution agreement entered into between the joint venturers, Morganti, Inc. and Trataros Construction, Inc. ("Trataros"). The dissolution agreement provided for the assignment of the parties' contract from Morganti/Trataros Joint Venture to Morganti, Inc. The Court previously ruled that the assignment relieved neither Morganti, Inc. nor Trataros of liability to Maris. *See* Transcript of Apr. 6, 1999 Bench Decision, at 37. Therefore, "Morganti" refers jointly and severally to Morganti, Inc., Trataros, and Morganti/Trataros Joint Venture.

2. Pursuant to stipulation, judgment on the verdict will credit Morganti for the sum of $4,256,421, which was paid during the course of the contract.

3. All of the parties' post-verdict motions are technically premature because no judgment has yet been entered. However, for the sake of judicial economy, the Court will consider them at this time. *See Colwell v. Suffolk County Police Dep't,* 967 F.Supp. 1419, 1423 (E.D.N.Y.1997), *rev'd on other grounds,* 158 F.3d 635 (2d Cir.1998).

ler Act, and sued Morganti for breach of contract under state law. Morganti counterclaimed for Maris's breach.

On June 7, 1996, Morganti sued Liberty ("Action # 2"). Morganti alleged that Liberty (1) breached its obligations under its performance bond; (2) breached an implied covenant of good faith and fair dealing; (3) tortiously interfered with the Subcontract, and (4) tortiously interfered with Morganti's business expectations.

On March 31, 1997, Industrial Acoustics Company, Inc. ("IAC") filed an action against Maris and Liberty ("Action # 3"), claiming that Maris breached a subcontract with IAC. Maris impleaded Morganti, which, by counterclaim, reasserted its breach of contract claim against Maris.

By Court order dated October 15, 1997, all three actions were consolidated pursuant to Fed.R.Civ.P. 42(a). Action # 3, however, was severed prior to trial.

Because a lien cannot attach to federal property, the Miller Act, 40 U.S.C. §§ 270a–270d, was enacted to provide subcontractors and suppliers on federal construction projects an alternate remedy to the mechanics' lien ordinarily available on private construction projects. *See J.W. Bateson Co., Inc. v. United States ex rel. Bd. of Trs. of the Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 589, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). Under the Miller Act, a contractor who performs "construction, alteration, or repair of any public building or public work of the United States" must provide two types of bonds: a "performance bond . . . for the protection of the United States" against defaults by the contractor, and a "payment bond . . . for the protection of all persons supplying labor and material." 40 U.S.C. § 270a(a)(1), (2).

The Miller Act gives a subcontractor "the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him." 40 U.S.C. § 270b(a). "[T]he Miller Act by its terms only gives subcontractors the right to sue on the surety bond posted by the prime contractor, not the right to recover their losses directly from the Government." *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 256, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999). Furthermore, the Miller Act provides the exclusive remedy available to a subcontractor against the surety. *See United States ex rel. Cal's A/C and Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 329 n. 8 (5th Cir.2000); *see also United States ex rel Henderson v. Nucon Constr. Corp.*, 49 F.3d 1421, 1423 (9th Cir.1995) (Miller Act "authorizes suits solely against the surety as the issuer of the bond").

Nothing in the Miller Act precludes a subcontractor from joining in a single action a state law breach of contract claim against the prime contractor with its Miller Act claim. A subcontractor, however, "must specifically plead a breach of contract claim under state law in addition to raising a Miller Act claim if it wishes to recover damages under a contract theory." *Consolidated Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 435 (8th Cir.1999). This is precisely what Maris has done. Its first claim is for common law breach of contract, and, electing the remedy of rescission, Maris sought *quantum meruit* damages of $5,770,260.38, plus interest. *See* Compl. ¶¶ 8–13. Its second claim is under the Miller Act for $2,500,000, presumably the principal amount of the payment bond, plus interest. *See* Compl. ¶¶ 14–16.[4]

---

**4.** Under the Miller Act, suit must be brought in the name of the United States, and must be

The jury's $8,001,249 damage award, based on *quantum meruit,* consisted of $6,576,997 for Maris's direct costs, $712,126 for profit and $712,126 for overhead. If allowed to stand, it would result in a judgment against Morganti, after crediting Morganti for its prior payments (*see* n. 2, *supra* ), of $3,744,828, exclusive of interest, and a judgment for joint and several liability against Morganti's sureties in the sum of their payment bond.[5]

## II. Morganti's Rule 50(b) Motion

At the conclusion of Maris's case on the liability phase of the trial, Morganti asserted two grounds for judgment as a matter of law under Rule 50(a): First, Maris was seeking to hold it responsible for the government's delays. Second, any claimed breaches on Morganti's part occurred well before Maris walked off the job; therefore, Maris's continued performance constituted a waiver of such breaches. *See* Tr. at 1305–11.[6] The Court denied the motion regarding the waiver issue at that time, *see* Tr. at 1311, and reserved on the first issue, which it denied at the end of the trial. *See* Tr. at 1322, 2476.

At the conclusion of Maris's *quantum meruit* damage case, Morganti moved for dismissal pursuant to Rule 50(a) for failure of proof and, moreover, because it would allow for the recovery of costs occasioned by the government's fault. The Court initially denied the motion in its entirety, but

thereafter reserved on the issue of sufficiency in regard to the profit and overhead components of the claimed damages. *See* Tr. at 2360–69, 2496.[7]

## A. Standard

The same standard applies to a Rule 50(b) renewed motion for judgment as a matter of law and a Rule 50(a) motion for judgment as a matter of law. *See Raspente v. National R.R. Passenger Corp.,* 111 F.3d 239, 241 n. 3 (2d Cir.1997). Action taken by the court under Rule 50 "is a performance of the court's duty to assure enforcement of the controlling law and is not an intrusion on any responsibility for factual determinations conferred on the jury." Fed.R.Civ.P. 50 Advisory Committee Note (1991). Rule 50(a) authorizes the court "to enter judgment as a matter of law at any time during the trial, as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case." *Id.* Regarding the sufficiency of the evidence, a motion under either section may be granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998); *see also Vermont Plastics, Inc. v. Brine, Inc.,* 79 F.3d 272, 277 (2d Cir. 1996). This means that "there is such a

venued in the district court where the contract "was to be performed and executed." 40 U.S.C. § 270(b). Maris alleges diversity as its jurisdictional basis for its common law breach of contract claim. *See* Compl. ¶ 2. It need not have done so since supplemental jurisdiction attaches to Miller Act claims. *See United States ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.,* 161 F.3d 915, 919 (5th Cir.1998) ("28 U.S.C. § 1367 makes possible simultaneous prosecution of Miller Act and state law claims").

5. Morganti and its sureties have been represented by the same counsel.

6. "Tr." refers to the trial transcript.

7. Morganti appropriately renewed its Rule 50(a) liability and damage motions at the close of the evidence. *See Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 129 (2d Cir. 1999) (interpreting Rule 50(b) as requiring the renewal of a Rule 50(a) motion at the close of evidence as a precondition to filing a Rule 50(b) motion).

complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or . . . the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir.1993) (citation and internal quotation marks omitted); *see also Galdieri–Ambrosini,* 136 F.3d at 289. "[T]he court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini,* 136 F.3d at 289 (citations omitted).

A Rule 50(b) motion " 'is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion].' " *Id.* at 286 (quoting *McCardle v. Haddad,* 131 F.3d 43, 51 (2d Cir.1997) (quotation marks omitted)); *see also* Fed.R.Civ.P. 50(b); *Holmes v. United States,* 85 F.3d 956, 962 (2d Cir.1996); *Lambert,* 10 F.3d at 53–54. While the specificity requirement is obligatory, the burden is upon the nonmoving party to raise the issue; otherwise, it is waived. *See Marfia v. T.C. Ziraat Bankasi,* 147 F.3d 83, 87 (2d Cir.1998). Regardless, relief from the specificity requirement is available "where necessary to avoid manifest injustice." *Doctor's Assoc., Inc. v. Weible,* 92 F.3d 108, 113 (2d Cir.1996) (internal quotation omitted).

## B. Liability Issues

### 1. The Government's Complicity

■ In support of its contention that Maris was impermissibly seeking to hold it responsible for the government's misdeeds, Morganti relied on paragraph (b) of Article 1 and Article 9 of the Subcontract.

*See* Tr. at 1305–10. Although not explicitly raised in its 50(a) motion, the Court perceives this contention as subsuming Morganti's repeated assertion throughout the trial, as a defense to Maris's claims of late payments, that the Subcontract provided that Morganti had to first be paid from the government for Maris's work before Maris could be paid.[8]

Article 1(b) provides, *inter alia,* that the "Subcontractor shall assume all obligations, risks and responsibilities which Contractor has assumed towards Owner in the Contract Documents," and that the "Subcontractor shall have the right to enforce its rights and remedies and to defend against claims against it by the Owner as provided in Article 9." Maris Ex.1. Paragraph (a) of Article 9, referable to the resolution of disputes involving the Contractor, Subcontractor and the Owner, provides in relevant part:

In case of any dispute between Contractor and Subcontractor, due to any action of Owner or involving the Contract Documents, Subcontractor agrees to be bound to the same extent that Contractor is bound to Owner, by the terms of the Contract Documents, and by any and all preliminary and final decisions or determinations made thereunder by the party, board or court so authorized in the Contract Documents or by law, whether or not Subcontractor is a party to such proceedings. In case of such dispute, Subcontractor will comply with all provisions of the Contract Documents allowing a reasonable time for Contractor to analyze and forward to Owner any required communications or documentation. Contractor will, at its option (1) present to Owner, in Contractor's name, or (2) authorize Subcontractor to present to Owner, in Contractor's name, all

---

8. Maris has not raised any lack of specificity objections. *See Marfia,* 147 F.3d at 87 (absence of objection to specificity constitutes waiver).

of Subcontractor's claims and answer Owner's claims involving Subcontractor's work, whenever Contractor is permitted to do so by the terms of the Contract Documents.

Also of relevance is paragraph (b) of Article 7, which governs the Subcontractor's compensation for changes made by the government. It provides, *inter alia:*

Subcontractor shall submit in writing any claims for adjustment in the price, schedule or other provisions of the Subcontract claimed by Subcontractor for changes directed by Owner, or for damages for which the Owner is liable, or as a result of deficiencies or discrepancies in the Contract Documents, to Contractor in time to allow Contractor to comply with the applicable provisions of the Contract Documents. Contractor shall process said claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interests of Subcontractor and others including Contractor. Subcontract adjustments shall be made only to the extent that Contractor receives relief from or must grant relief to Owner.

As for payment, paragraph (b) of Article 2 provides that partial payments shall be due to the Subcontractor in an amount as determined by the Owner "and for which payment has been made to Contractor by Owner." Paragraph (d) of Article 2 charges the Contractor with establishing "a reasonable breakdown" of the "total Subcontract Price" to "serve as the basis for partial payments." Finally, paragraph (f) of Article 2 provides that final payment is to be made after acceptance of the Subcontractor's work by the Owner.

All of the above quoted and referenced contract provisions are contained in the printed portion of the Subcontract. There are some modifications in a rider, including paragraph 2(e) therein, which provides that the "Subcontractor agrees that payments to it for work performed by it hereunder will become due within seven days of receipt and to the extent of payment from the Owner to the Contractor."

Morganti is correct that these contract provisions insulate it from liability to Maris for the acts of the government, including the government's non-payment or delayed payment to Morganti for Maris's work, provided Morganti made timely and appropriate submission of Maris's claims for payment to the government.

Mindful of these contract provisions, the Court carefully charged the jury that it could not hold Morganti responsible for the government's acts:

Under paragraph 2b of the printed portion of the contract, Maris was entitled to get paid for its work by Morganti as it progressed in amounts ... as determined by the government and for which payment has been made to Morganti by the government. [U]nder paragraph 2e of the rider to the parties' contract ... such payments were to be made by Morganti ... within 7 days of receipt .... And this paragraph repeats that such payments are only to be made ... to the extent of payment from the government to Morganti.

Now, in short, if Morganti doesn't get paid, Maris doesn't get paid. Maris'[s] recourse, it's not left in the lurch necessarily, if it believed that the government had wrongfully withheld payment is by a dispute resolution ... which is not part of this lawsuit, and it has the right to go against the government to have these disputes resolved in a different format.

Tr. at 2098–99. The Court further told the jury:

Let me caution you not to attribute any responsibility or blame upon Morganti by reason of the conduct of the govern-

ment with respect to payment issues or with respect to any other issues in this case. We are talking about Morganti's responsibilities here. The government is not involved here. You heard a lot about the government. This is not a trial of whether the government was right or wrong in any of its decisions. It may have been right, it may have been wrong. As I mentioned before, there is a separate dispute resolution process but that is not this case. It would be wrong for you to penalize Morganti for something which it had no fault or responsibility for and was purely the fault and responsibility of the government. Bear that in mind. You are to limit your concern to Morganti's conduct since Maris was not entitled to leave the job because of any problems attributable to the government.

Tr. at 2100–01.

Taking pains to excise the government's conduct from the jury's deliberations, the Court focused the jury on the reasons that Maris believed that Morganti was in breach: "1, Morganti's alleged failure to properly pay Maris; 2, Morganti's alleged failure to provide Maris appropriate access to the work areas necessary for Maris to perform its work; 3, Morganti's failure to properly coordinate and schedule the work." Tr. at 2093. The extensive trial testimony adduced by Maris clearly provided an evidentiary basis to support each of these claims, separate and apart from the government's conduct.

Regarding payment, the jury was advised that there was one exception to the Subcontract provisions that "if Morganti doesn't get paid, Maris doesn't get paid." Tr. at 2099. As for delays caused by the government, the jury was told that under paragraph 6(d) of the rider "Maris had a right to be paid by Morganti for any such delays ... if Morganti was successful in

obtaining an extension of time from the government for Maris'[s] performance," and, "[i]n that respect, there is nothing contained in the rider that requires the government to first pay Morganti before Morganti is responsible for paying Maris." Tr. at 2099. The jury was further instructed that Maris's sole responsibility under this rider paragraph was "to notify Morganti in writing within 5 days of any such delays of all the details of the causes of the alleged delays ... in sufficient time so that Maris'[s] claim may be timely processed by Morganti against the government." Tr. at 2099–2100.

Paragraph (d) of Article 6 in the original printed portion of the Subcontract provided, *inter alia,* that the subcontractor "shall not be entitled to any increase in the Subcontract Price or to damages or additional compensation as a consequence of ... delays, impacts, disruptions or accelerations, unless the Owner is liable and pays Contractor for such delays." This paragraph was deleted in its entirety and replaced in the rider by a new 6(d), which provided:

Should the Subcontractor's performance for this Subcontract be delayed by any acts of the Contractor, other subcontractors or the Contractor's suppliers, or delayed, impacted or disrupted by any acts or causes which would entitle Contractor an extension of time under the Contract Documents, the Contractor shall pay the Subcontractor as a consequence of such delays, impacts, disruptions or accelerations. The Subcontractor will, however, within five (5) days after the commencement of any delay, impact or disruption, or acceleration caused by Contractor, other subcontractors or the Contractor's suppliers, ... notify Contractor in writing stating full details of the cause of the alleged delay, impact ... disruptions or accelerations

for which the Owner is responsible in sufficient time so that its claim may be timely processed against the Owner.

Considerable discussion during the course of the trial centered on the intended meaning of this provision. The parties disagreed as to whether 6(d) of the rider required Morganti to pay Maris for delays not caused by Maris—provided that an extension of time for Maris's performance was obtained from the government—regardless of when, or whether, Morganti was paid by the government. *See* Tr. at 209–222. Believing 6(d) of the rider to be unclear, especially when juxtaposed to the original 6(d), the Court questioned Morganti's witness Theodore Catino ("Catino"), who represented Morganti during the contract negotiations, about his understanding of this language:

> THE COURT: Here [referring to rider 6(d) ], it's talking about any problems that you cause. Here's where I get a little confused—"or if it's caused by other subcontractors or contract supplier"—no mention of the government there—"then the subcontractor shall notify the contractor in writing, stating full details of the cause of the alleged delay, impact, disruption or disruptions or accelerations for which the owner is responsible in sufficient time so that its claim may be timely processed against the owner."
>
> I guess it's that language that doesn't sort of ring the bell in terms of clarity.
>
> THE WITNESS: You are absolutely correct, your Honor. The problem is that Maris's in-house counsel drafted this clause.
>
> THE COURT: It was negotiated between the parties?
>
> THE WITNESS: In all fairness, we both agreed to it.
>
> THE COURT: The form contract is yours; right?

> THE WITNESS: That's correct.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> THE COURT: We have paragraph 6[ (d) ], which says that if you get from the government an extension of time . . . the government says, yeah, we messed up an you are entitled to have another six months to perform, it's our fault, this says that Maris is entitled to get paid?
>
> THE WITNESS: Correct.
>
> THE COURT: You have to pay them?
>
> THE WITNESS: But I have to get paid from the government first.
>
> THE COURT: It doesn't say that.
>
> THE WITNESS: That change or delay has to be justified. Just because Maris says they are delayed, it's not a justification enough.
>
> THE COURT: This is a change to paragraph 6. It says: "If there is an extension of time to the contract documents, the contractor"—which is you—"shall pay the subcontractor as a consequence of such"—
>
> THE WITNESS: You are correct.
>
> THE COURT: That seems clear?
>
> THE WITNESS: Yes, but the grantor of time is the federal government.
>
> THE COURT: So, if the federal government grants the extension, you have to pay Maris?
>
> THE WITNESS: Correct.
>
> BY MR. PEPE:
>
> Q. If the federal government doesn't grant the extension you are all in the same boat, and you are not responsible to Maris; is that correct?
>
> THE WITNESS: That's correct.
>
> THE COURT: You may be able to be successful in furthering the dispute with the government and go to some tribunal, say that you are right, the government is wrong. In that situation, you will get

money, and I guess at that time, Maris can get paid for its claim, once you go through that process?

THE WITNESS: Right.

THE COURT: If you lose, Maris has no separate claim. Once again, if you get the extension, then you have to pay Maris, regardless what happens with the government?

THE WITNESS: We are not disputing that.

Tr. at 1775–78.

Although Catino testified that "the extensions of time we received from the government were received after Maris abandoned the project," Tr. at 1779, the Court decided that it was best to leave it to the jury to determine from all the testimony and multiple documents in evidence whether there were such extensions and, if so, whether Morganti paid Maris for the costs associated with such delays.

While, based on Catino's testimony, the Court instructed the jury during its liability charge that Maris was entitled to get paid from Morganti once the government granted an extension for delays, it also asked the jury, after the jury returned its liability verdict, whether its verdict would have been the same "if under paragraph 6[ (d) ] of the rider … Morganti did not have to pay Maris for any delays which Morganti received an extension of time from the government until the government first paid Morganti for such delays?" Tr. at 2123–24. The jury responded that it would still have held Morganti in breach. Tr. at 2127–28. This rendered nugatory the controversy over the meaning and application of 6(d) of the rider.

### 2. Waiver

As for Morganti's claim that its alleged breaches occurred well before Maris walked off the job and that Maris's contin-

ued performance constituted a waiver of these breaches, the Court viewed this simply as an issue of fact; accordingly, the Court charged the jury:

I want to explain to you about when a contract is broken in the course of performance, the injured party has a choice of continuing the contract or of refusing to go on. If the injured party chooses to go on, it loses its right to terminate the contract because of the default.

A party can indicate that it has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party. Once a party elects to continue the contract, it can never thereafter elect to terminate the contract based on that breach although it retains the option of terminating the contract based on other subsequent breaches.

Tr. at 2097.

There was ample evidence of ongoing problems with Morganti's performance to the date of termination to warrant submitting this charge to the jury.

### C. Damage Issues

### 1. The Government's Complicity

■ Morganti's contention that it could not be held accountable for any damages occasioned by the fault of the government is incorrect. Initially, the Court's view of the evidence was that "[t]here is nothing here that suggests that the damage claim seeks anything other than what services have been rendered for Morganti and the delays that had been caused by the government have been adjusted so that Morganti got paid for that or was entitled to get paid for that." Tr. at 2467–68. Even if that were not the case, while Morganti's breach could not be predicated on the government's acts, as the jury was advised, once Morganti breached, Maris was enti-

tled to its contract remedies. Where one party to a contract breaches before the non-breaching party has fully performed, the non-breaching party may continue to perform under protest, and then sue for its contract damages. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987). Alternatively, the non-breaching party "may timely rescind and seek recovery on the theory of quasi contract." *Id.* It is well-settled that rescission of a contract extinguishes it as effectively as if it had never been made. *See Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 264 (2d Cir.1999) ("A 'recision' amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination.") (quoting Black's Law Dictionary 1174 (5th ed.1979)).

■ Maris elected to rescind. Under traditional *quantum meruit* damages for rescission, Maris was no longer bound by any of the terms of the breached contract and could recover its actual job costs for work, labor and services performed and material furnished, plus an allowance for overhead and profit. *See Whitmyer Bros. v. New York*, 47 N.Y.2d 960, 962, 419 N.Y.S.2d 954, 955, 393 N.E.2d 1027 (1979); *Meyers v. Town of Coxsackie*, 139 A.D.2d 855, 856, 527 N.Y.S.2d 584, 585 (3rd Dep't. 1988) (citing cases and authorities); *see also Clark v. City of New York*, 4 N.Y. 338 (1850) (seminal case contrasting measure of damages between rescission under quasi-contract and action for contract damages). Should a different rule apply because of the Miller Act, and does the Miller Act preclude the recovery of damages against a general contractor when the federal government's fault contributed to these costs? The decisional law answers each of these questions in the negative.

■ In respect to the first question, the Second Circuit back in 1944 applied the conventional rule of *quantum meruit* damages in an action under the Miller Act, holding "that with the breach fall all the other parts of the contract;" therefore, plaintiffs were "not limited to the contract prices." *United States ex rel. Susi Contracting Co., Inc. v. Zara Contracting Co.*, 146 F.2d 606, 610 (2d Cir.1944). More recently, the Ninth Circuit has explicitly recognized that both "breach of contract and *quantum meruit* claims are permitted under the Miller Act." *United States ex rel. Leno v. Summit Constr. Co.*, 892 F.2d 788, 791 (9th Cir.1989).

■ As for the second question, "the Miller Act does not limit a subcontractor's recovery to situations where the general contractor is at fault;" consequently, subcontractors have been permitted to recover against a Miller Act surety "for labor and materials furnished to a subcontractor where the general contractor was blameless." *Mai Steel Serv. Inc. v. Blake Constr. Co.*, 981 F.2d 414, 419 (9th Cir. 1992) (citing cases). This holds true even if the government was at fault. *See id.* ("courts have allowed subcontractors to recover under Miller Act payment bonds for delay costs caused by the federal government") (citing cases); *see also Consolidated Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 435 (8th Cir.1999) (holding general contractor liable to its subcontractor for delays partially caused by fault of the government); *United States ex rel. T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co.*, 942 F.2d 946, 950–51 (5th Cir.1991) (holding general contractor liable for damages for delays attributable to government's failure to discover asbestos); *United States ex rel. Pertun Constr. Co. v. Harvesters Group, Inc.*, 918 F.2d 915, 917–19 (11th Cir.1990) (holding general contractor liable for damages

for delays caused by discovery by government of toxic wastes). As explained by the Eighth Circuit in *Biggs,* "[t]he Miller Act favors allowing full recovery from a general contractor regardless of fault because general contractors have privity of contract with the government and can thus recover delay damages directly from the government, while subcontractors cannot." 167 F.3d at 435.

There was ample evidence to deny that part of the 50(a) motion challenging the sufficiency of the evidence regarding Maris's actual job costs. The Court now turns to the reserved damage issues.

### 2. Profit and Overhead

Maris asked the jury to include in its damage awards ten percent of Maris's costs for profit and an additional ten percent for overhead. The jury essentially obliged.[9] Morganti argues that there is no evidentiary support for these awards.

The Court instructed the jury:

Now, in considering overhead, be mindful of the fact that the testimony offered by Maris is that the overhead for its field work was included in its costs;

therefore, this type of overhead should not be considered by you.

In respect to profits, they may be recovered if they were fairly within the contemplation of the parties and if they can be proven with reasonable certainty. In making this determination you may consider such things as the reasonable contemplation of the parties with respect to profits and the nature, purpose and particular circumstances of the contract and the underlying work.

Now, the damages, if any, which you award must not be merely speculative, possible and imaginary. Rather, they must be based upon a definite and logical connection between what is proven and the damages sought to be recovered. However, as I have stated, this does not mean that damages for overhead and profit must be established with absolute certainty since by their very nature they are not susceptible to precise calculation. All damages which you may award must simply be reasonable under all of the circumstances.

Tr. at 2483–84.

▮▮▮▮ The charge was in keeping with New York law.[10] "A percentage above

---

9. The jury apparently predicated its $712,126 awards for profit and overhead by taking 10% of the $7,121,260 of total costs claimed by Maris, even though the cost component of its verdict was somewhat less ($6,576,997). *See* Tr. at 2479–80 (charging jury that Maris's cost claims included "$6,593,997, representing its actual costs as per Exhibit 3005 … $415,703 for its payment to Genetech" and "$40,424 for its payment to Beach").

10. Although the Subcontract included a term requiring that it be construed in accordance with New York law, *see* Maris Ex. 1 ¶ 25, once Maris elected to rescind the contract this term was no longer binding. Federal courts sitting in diversity must apply the choice-of-law rules of the forum state to determine the law applicable to substantive issues. *See Campbell v. Metropolitan Prop. & Cas. Ins. Co.,* 239 F.3d 179, 186 (2d Cir.2001); *Schwimmer v. Allstate*

*Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). New York's choice-of-law rules require that in the absence of a binding agreement to the contrary, contract disputes must be resolved under the laws of the state with the most significant contacts to the contract. *See Schwimmer,* 176 F.3d at 650; *see also Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 394 (2d Cir.2001) (applying choice-of-law analysis for contract claims to a *quantum meruit* claim). The most significant contacts in this case are in New York—the location of the subject matter of the contract and the place of performance. In any event, the parties have not objected to the application of New York law. Even if Maris had elected to bring its *quantum meruit* claim pursuant to 28 U.S.C. § 1367 as supplemental to its Miller Act claim, New York law would still apply. *See North Atl. Instruments, Inc. v. Haber,* 188

direct costs has frequently been allowed for overhead and profit in allocating compensation on a *quantum meruit* basis in construction contract cases." *Manshul Constr. Corp. v. Dormitory Auth. of the State of N.Y.*, 79 A.D.2d 383, 390, 436 N.Y.S.2d 724, 729 (1st Dep't 1981); *see also United States ex rel. Tower Masonry, Inc. v. J. Kokolakis Contracting, Inc.*, No. 93 Civ. 6369(JBS), 1995 WL 539742, at *3 (S.D.N.Y. Sept. 8, 1995) (finding "10% add-on for overhead and 10% for profit ... to be reasonable and normal"); *Westcott v. State*, 264 A.D. 463, 466, 36 N.Y.S.2d 23, 25 (3d Dep't 1942) (sustaining allowance of fifteen percent for overhead and profit notwithstanding "absence of a mathematical basis for the computation").[11] Nevertheless, the general rule is well-settled: *quantum meruit* damages must be "based upon a definite and logical connection between what is proven and the damages sought to be recovered and cannot be speculative or conjectural." *Clifford R. Gray, Inc. v. State*, 251 A.D.2d 728, 730, 674 N.Y.S.2d 440, 442 (3d Dep't 1998) (recognizing application of rule to awards for overhead); *Thalle Constr. Co., Inc. v. Whiting–Turner Contracting*, 39 F.3d 412, 418 (2d Cir.1994) (in calculating *quantum meruit* damages "speculation will not be indulged and damages will be limited to damages actually proven") (quoting *Fehlhaber Corp. v. State of New York*, 69 A.D.2d 362, 370, 419 N.Y.S.2d 773, 777 (3d Dep't 1979)); *see also Franklin Pavkov Constr. Co. v. Ultra*

*Roof. Inc.*, 51 F.Supp.2d 204, 219 (N.D.N.Y.1999) (recognizing that profits can be recoverable in *quantum meruit* if "fairly within the contemplation of the parties when contracting") (quoting *Merlite Indus., Inc. v. Valassis Inserts, Inc.*, 12 F.3d 373, 376 (2d Cir.1993)) (internal quotation mark omitted); *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 4, 537 N.E.2d 176 (1989) (court must take a "common sense" approach to profit damages, and determine what the parties intended by considering "the nature, purpose and particular circumstances of the contract known by the parties").

### Profit

■ Maris sought to justify its 10% claim for *quantum meruit* profits in three ways: (1) its anticipated profit on the entire job, as reflected in a September 8, 1994 project report, *see* Morganti–Mitchell Ex. 3; (2) Morganti's anticipated profit, and (3) the allowance for profit on change orders contained in Morganti's prime contract with the FBOP.

In regard to Maris's anticipated profits, Mary Lou Hoover ("Hoover"), Maris's project manager, testified on direct examination about the September 8, 1994 project report.[12]

Q: [W]hat is the date of this particular report?

F.3d 38, 43 (2d Cir.1999) (federal court adjudicating a supplemental state law claim applies the choice-of-law rules of the forum state).

11. The profit component of *quantum meruit* damages should not be confused with lost future profit contract damages. *See Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986). Having elected its remedy of rescission, Maris has no claim for lost future profits.

12. Morganti objected to Hoover's testimony on damages, claiming that she had not previously been disclosed as a damage witness, and had testified that she had no involvement in the calculation of Maris's damages. Taking into consideration all of the circumstances of the case and the extensive pre-trial discovery, the Court, in the exercise of its discretion, chose not to preclude her testimony.

A: September, I think it is, 8th of '94; for the period ending August '94.

Q: Would you turn to the second page please?

A: Yes.

Q: Does the document show how Maris allocated the contract price of $12,725,000 into direct costs and profits?

A: Yes, it does.

* * * * * *

THE COURT: Ms. Hoover is this a Maris document?

THE WITNESS: Yes, it is.

* * * * * *

THE COURT: And it reflects the analysis under the contract that Maris entered into with Morganti as to what its estimated profit would be?

THE WITNESS: Correct.

THE COURT: What its contemplated profit would be?

THE WITNESS: Correct.

THE COURT: Under the actual contract?

THE WITNESS: Correct.

THE COURT: I will allow it into evidence.

* * * * * *

Q: Ms. Hoover, can you tell us please what the contemplated profit was for the original contract price of $12,725,000?

* * * * * *

THE COURT: How much of a projected profit?

THE WITNESS: $2,145,509.

THE COURT: Do you know who prepared this document?

THE WITNESS: No, I don't. It was the subject of discussions at our meeting in September I believe of '94.

THE COURT: All you know is this is something that was generated by Maris

as to what they contemplated their profit would be under the existing contract?

THE WITNESS: Well, it shows the original contract amount, the original costs, the original profit anticipated and what that margin is.

* * * * * *

Q: Ms. Hoover, under the original profit there was the notation original profit margin percentage and it says 16.54 percent; what does that represent?

A: That represents the percentage of profit over the original cost.

THE COURT: This is what Maris contemplated hopefully making on the job, so to speak, way back when?

THE WITNESS: Correct.

THE COURT: This is your document that shows its aspirations and hopes in that respect?

THE WITNESS: Correct.

Tr. at 2307–10.

On cross-examination, however, Hoover was directed to the first page of the exhibit:

Q: [A]nd about halfway down there is an entry that says per ops, O–P–S, correct?

A: Correct.

* * * * * *

THE COURT: Tell us what "per ops" means.

THE WITNESS: It would have something to do with our operations department . . . .

Q: And the operations department at this point in time, October 11, 1994 is not projecting a profit but a loss of 1.18 million dollars, is that not so?

A: That's what they were projecting yes.

Q: Or 9.3 percent loss, not a profit?

A: As of the date of this, yes, that's what they were projecting.

Tr. at 2337–38.

In sum, Hoover testified that the project report projected both a profit of 16.54% and a loss of 9.3%. This inconsistency was not explained at trial; nor have the parties addressed it in their post-trial submissions. However, a careful review of the project report is illuminating. It is a four-page document comprised of two financial reports: the first page is a report titled "Brooklyn" dated October 11, 1994; a second report, titled "Brooklyn F.B.O.P.", dated September 8, 1994, begins on the second page. The basis for Hoover's direct testimony that Maris anticipated a 16.54% profit was the September 8th report. Her answer on cross-examination that the project report reflected an anticipated loss of 9.3% was based on the October 11th report. This part of the project report reflects profit estimates from two sources within the Maris organization—WIP and OPS. At the foot of the October 11th report, the following notation appears: "Above analyses reconcile the Brooklyn budget @6% from WIP @ 16.5% and from OPS submission showing a − 9.32% loss. This is based on a discussion held with George Mitchell, Bob Marinick, Bob Betty (?), John Brooks and Mary Lou Hoover on 9/13/94 (?)." Above the notation are two sets of calculations showing that WIP lowered its profit estimate from 16.5% to 6.3%, and OPS adjusted its estimate upward from a 9.3% loss to a 6.4% profit.

Maris also elicited testimony from Catino:

THE COURT: What's the practice or custom in your industry, what's normally to be expected as a profit?

THE WITNESS: It will vary up to ten percent.

THE COURT: And what will the variations depend upon, give us some sense of it?

THE WITNESS: On the complexities of the project, the length of the project.

THE COURT: The size of the project?

THE WITNESS: Size of the project of course.

THE COURT: If it was a smaller project, you'd expect a larger profit; if it is larger, you're making more money, percentage-wise you would get less?

THE WITNESS: There's a lot of factors involved.

THE COURT: How do you assess this particular job, give the jury some sense of it?

THE WITNESS: For Morganti's point of view our anticipated profit on this job was between eight and ten percent . . . .

THE COURT: What was that based upon?

THE WITNESS: On the risk and complexities of the project of course.

THE COURT: These are the same risks and complexities I guess that Maris would have also, same project, I imagine?

THE WITNESS: Correct.

Tr. at 2352–53.

The only other evidence in support of Maris's profit claim was Hoover's reliance on a portion of the prime contract between Morganti and the FBOP relating to change orders. *See* Maris Ex. 3021. It provided that a percentage for profit, as well as for overhead, would be negotiated for changes "and may vary according to the nature, extent and complexity of the work involved, but in no case shall exceed . . . 10% overhead and 10% profit on the first $20,000, 7½% overhead and 7½ % profit on the next $30,000, 5% overhead and 5% profit on the balance over $50,000." *Id.*

Reviewing all this evidence, the Court concludes that it is sufficient to support an award for profits, but it cannot support the magnitude of the jury's verdict. The project report states that Maris anticipated a profit of not more than 6.4%. Moreover, Hoover's reliance on the formula for change orders in the prime contract, although of questionable relevance, would translate to barely over five percent. The only evidence before the jury at odds with the concrete evidence contained in the project report and the change order formula was Catino's general statement that Morganti anticipated a profit in the range of eight to ten percent, and some passing reference by Catino that both Morganti and Maris experienced similar risks and complexities on the Project. When measured against the other evidence, it is not of sufficient weight to warrant a profit award in excess of 6.4% of the jury's $6,576,997 award for Maris's costs. This equates to $409,927.

A trial court has the discretion to grant a new trial if a jury verdict is against the weight of the evidence. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). "This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.; see also Textile Deliveries, Inc. v. Stagno*, 52 F.3d 46, 49 (2d Cir.1995) (directing remittitur or new trial where jury verdict on breach of contract claim exceeded damages incurred prior to termination of contract). Where the non-prevailing party has not formally moved for remittitur, a court may, *sua sponte*, offer the prevailing party

the remittitur as an alternative to a new trial. *See Peterson v. County of Nassau*, 995 F.Supp. 305, 312 (E.D.N.Y.1998) (citing *Bender v. City of New York*, 78 F.3d 787, 795 (2d Cir.1996)). Accordingly, Maris can choose between a remittitur to the sum of $409,927 for the profit component of its *quantum meruit* damages or a new trial on that issue.

### Overhead

Maris contends that the jury's overhead award is supported by the testimony of Bob Colby, a consultant to Liberty:[13]

Q: When you reviewed the Maris records during your investigation did you come across any documentation that would show what [the overhead] percentage would be?

\* \* \* \* \* \*

A: Yes.

Q: What did you find?

A: Maris applied to their estimates ten percent overhead and an eight and a half percent indirect costs that they applied and included in their estimates, that's what they experienced and that's what they included.

Tr. at 2209–10. However, Catino testified that Maris's itemized list of direct costs included approximately $800,000 of *field* overhead:

Q: Mr. Catino, showing you Plaintiff's Exhibit 3005, which is the list of checks compiled by Mr. Colby. You have seen that before?

A: Yes, I have.

Q: Are there overhead items included on this list, sir?

\* \* \* \* \* \*

**13.** Morganti objected to Colby's testimony regarding damages for basically the same reasons it had objected to Hoover's. Once again, exercising its discretion, the Court allowed

Colby to testify. In any event, in light of the Court's disposition of the overhead issue, the matter is academic.

A: Yes, sir.

Q: Approximately, how much have you identified as overhead items on that list?

\* \* \* \* \* \*

A: Approximately eight hundred thousand.

THE COURT: That represents overhead -

A: Field overhead.

Tr. at 2397–98.

Counsel for Maris conceded that Maris was not seeking a mark-up for field overhead, *see* Tr. at 2160, leaving *home office* overhead as the only basis for an overhead award. However, Colby testified that Maris did not incur any costs for the day-to-day administration of the Project:

> it was decided that [Surety & Construction Consultants ("SCC")] would actually do the paperwork and write the checks and accumulate all the documentation for the files because it was going to be cheaper than paying the people back in Exton, Pennsylvania, Maris's [home] office, because they had a high overhead and it was going to be cheaper for SCC to do it.

Tr. at 2180–81.[14] Colby also testified that while Maris attended to payroll and insurance matters for its employees on the Project, *see* Tr. at 973, Maris's payroll department was simultaneously handling the payroll for "dozens" of other Maris projects. Tr. at 974. No other evidence was produced by Maris on its overhead claim.

During the trial, the Court alerted Maris to the need to adduce sufficient evidence to support its request for damages for overhead:

> just because courts may have from time to time said that a ten percent ... overhead factor in the particularities of a case would not be considered to be excessive doesn't mean that you can just get ten percent by asking for it. You have some burdens of proof here.... You just can't ask for ten percent and expect me to allow a jury to give you ten percent.

Tr. at 2280–81.

Unlike the evidence regarding profits, there is simply no evidence before the Court that can support any award for overhead. As noted, all field overhead was included in Maris's direct costs. As for home office overhead, the day-to-day operations were handled and paid for by SCC. There is no evidence that these costs were charged back to Maris; if they were, testimony to that effect could have easily been adduced. All that remains is some unspecified overhead incurred by Maris's payroll department for all of its multiple projects. This is not sufficient to support an overhead award.

### III. Morganti's Rule 59(a) Motion

#### A. Standard

" 'A motion for a new trial ordinarily should not be granted unless the trial

---

**14.** SCC was employed by Liberty in December 1994 "to look at the project and look at the records and investigate the status of the project and estimate the cost to complete and report back to [Liberty]." Tr. at 966–67. At that time, the Project was in the early stages, even though it had been ongoing for a year. *See* Tr. at 967. SCC was eventually retained by Liberty to set up and monitor a trust fund account for the Project. *See* Tr. at 970. This fund "essentially" was "a dedicated checking account, where all the monies that comes in on the subcontract goes into that account and any of the funding that Liberty is providing goes into the account and that way the disbursements for any of the job expenses comes out of a single account and it's very easy to track the in and out of the money ...." *Id.* SCC also "watched the general progress of the project." Tr. at 973. Colby's specific duties were to administer the "trust account and monitor the project" for Liberty. Tr. at 975–76.

court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir.1997) (citation and quotation marks omitted)); *see Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992). One example of a miscarriage of justice would be an improper jury charge that "seriously affected" the jury's understanding of an issue "to the prejudice of the complaining party." *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1343 (7th Cir.1992); *see also* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2805 at 54 (2d ed.1995). "Unlike a · [judgment as a matter of law], a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song*, 957 F.2d at 1047. In considering a motion for a new trial, a trial court " 'is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner.' " *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)).

Morganti's Rule 59(a) motion is an unruly, scatter-shot assortment of complaints setting forth approximately fifty purported grounds for relief. The Court has endeavored to make some organizational sense of them, and views them as falling into the following categories: (1) dismissal of Morganti's direct claims against Liberty; (2) the jury instructions; (3) the Court's management of the trial.[15]

## B. Morganti's Claims Against Liberty

Morganti trotted out a number of theories in order to cast liability against Liberty because Liberty decided to discontinue funding Maris's performance and told Maris to declare Morganti in breach. During the course of the trial, the Court rejected each of these theories. The jury's subsequent determination that Morganti breached renders them all academic. In any event, the Court's rulings were correct.

### 1. Breach of Obligation Under the Bond

 Morganti claimed that Liberty's conduct pursuant to a "Post Default Agreement" it entered into with Maris on June 20, 1995 (Liberty Ex. 279)[16] expanded Liberty's liability under its bond.[17] Notably, Morganti never pled such a claim, and an eve of trial motion to amend its complaint to assert this claim against Liberty was denied by the Court. *See* Transcript of Apr. 14, 2000 Bench Decision. Undaunted, Morganti persisted during the trial in its attempt to expand the complaint to embrace this theory. Even if the Court had permitted Morganti to amend, it would have been to no avail.

In the Post Default Agreement, Maris acknowledged its inability to complete its bonded contracts "due to its distressed financial circumstances." Post Default

---

**15.** It is difficult to discern from Morganti's random, undisciplined and bullet-point arguments which grounds are to be taken seriously. While the Court appreciates the need to preserve issues for appellate review, attorneys are well-advised to focus their arguments in post-trial submissions to the district court. To the extent the Court has failed to expressly address any of the issues raised by Morganti, the Court considers them to be without merit.

**16.** Center Core, Inc. was also a party to the Agreement because it "own[ed] 100% of the outstanding common stock of Maris." Post–Default Agreement at 2.

**17.** Paragraph 18 of the Post Default Agreement provided that its headings "shall not be used to interpret, restrict or limit any of the provisions of this Agreement."

Agreement at 1 (unnumbered). The agreement provided, *inter alia*, that Maris would assign to Liberty "all contract proceeds on all of the Bonded Contracts," which Liberty would place in a trust account, *id.* at ¶ 2(a), and that Maris would "continue to supply labor, material, equipment, supplies, supervision, management, as may be required by Liberty for the completion of any or all of the Bonded Contracts, subject to continued funding for such items through the trust account." *Id.* at ¶ 3(b). It also provided that Maris would "cooperate fully with and follow the directions of Liberty with regard to the completion of the Bonded Contracts and the recovery of all monies due under or relating to the Bonded Contracts, whether Liberty elects to complete through Maris, by takeover, by relet, or otherwise." *Id.* at ¶ 3(a).

Under the heading "Conduct of Business," Maris agreed to "cooperate fully with Liberty concerning Liberty's on-going inspection, review and analysis of Maris's books and records, operations and Bonded Contracts." *Id.* at ¶ 7(a). This paragraph also provided that "Maris remains responsible to conduct and operate its business," and further provided that

> Liberty is not, and shall not be deemed to be, controlling or conducting the business of Maris by virtue of this Agreement and Maris ... agree[s] that Liberty has not, by this Agreement or otherwise, assumed any liability for any debts or other liabilities of Maris ... except for such obligations as Liberty may otherwise have under the bonds which it issued for the Bonded Contracts.

*Id.*

When a bonded contractor is in danger of defaulting, its surety must choose among a number of options, which generally include: (1) tendering the penal limit of the bond; (2) taking over the contract and having it completed; (3) tendering a completing contractor and a new bond; (4) financing the contractor through completion and curing any defects. *See* Bruce C. King, *Takeover and Completion of Bonded Contracts by the Surety*, Brief, Fall 1997, at 23 n. 2; *see also Insurance Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir.2001) (performance bond surety has alternative of providing funds to insolvent contractor to complete performance); *John G. Lambros Co., Inc. v. Aetna Cas. & Sur. Co.*, 468 F.Supp. 624, 628 (S.D.N.Y. 1979) (Weinfeld, J.) ("[i]t is not unusual" for performance bond surety to finance contractor's completion of a bonded project). A takeover by the surety of its principal's contract pursuant to a performance bond will subject the surety to liability beyond the penal amount of the bond. *See International Fid. Ins. Co. v. County of Rockland*, 98 F.Supp.2d 400, 428 (S.D.N.Y.2000). In contrast, even when a surety advances large sums of money to the contractor and becomes "intimately involved" in the contractor's financial affairs, the surety will not, without more, face exposure beyond the parameters of its bond. *See John G. Lambros Co., Inc.*, 468 F.Supp. at 628.

Liberty opted to finance the project. It did not assume or takeover the contract. Its actions were not materially different than the circumstances confronting Judge Weinfeld in *Lambros*, including the assignment and control of all funds realized under the bonded contract. "[A]ny surety under a performance bond who realizes that his principal is starting to have trouble, will have progress payments made to it in order that it may monitor the disbursement of funds because it is apparent at that point that some of the surety's money will have to be used also." *Copeland Sand & Gravel, Inc. v. Insurance Co.*

*of N. Am.,* 288 Or. 325, 607 P.2d 718, 722 (1980). Such an arrangement does not place the surety in the subcontractor's shoes. Moreover, Liberty had every right to cease financing Maris and to instruct Maris to declare Morganti in breach; it had the right to run the risk of liability under its bond were Maris to have been found in default.

### 2. Covenant of Good Faith and Fair Dealing

 The Court dismissed Morganti's claim against Liberty for alleged breach of the covenant of good faith and fair dealing. While a covenant of good faith and fair dealing is implied in every contract, *see Carvel Corp. v. Diversified Mgmt.,* 930 F.2d 228, 230 (2d Cir.1991), it cannot exist in a vacuum. In other words, there must be a contract to which it attaches. *See Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 304, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (1983) (the implied covenant is simply "in aid and furtherance of other terms of the agreement of the parties"); *Lakeville Pace Mech., Inc. v. Elmar Realty Corp.,* 276 A.D.2d 673, 676, 714 N.Y.S.2d 338, 342 (2d Dep't 2000) ("[T]here can be no covenant of good faith and fair dealing implied where there is no contract."). The only contract implicating Liberty was its performance bond, which never came into play since Maris was not found in breach.

The Court did, however, rule that "Liberty's performance should be considered [by the jury] to be Maris's and they can consider the covenant of good faith with respect to that contract." Tr. at 1837. Consequently, although cautioning the jury that "[t]here is no separate lawsuit before you against Liberty that can make Liberty liable to Morganti if you do not determine that Maris was in breach," Tr. at 2103, the Court told the jury that it could "consider the acts and conduct of Liberty during Maris's performance to be [the] acts and conduct of Maris since Liberty was acting on behalf of Maris." Tr. at 2103. It further explained to the jury:

> whenever you consider whether Maris was in breach of its duty of good faith and fair dealing under its contract with Morganti, you may take Liberty's acts and conduct [ ] on behalf of Maris into consideration. However, you may not consider whether Maris or Liberty, acting in Maris's behalf, had any particular motive to terminate the contract since it is irrelevant whether Maris or Liberty acting in behalf of Maris was motivated to terminate the contract for reasons which would not themselves constitute [valid] grounds for termination of the contract.

*Id.; see Big Apple Car, Inc., v. City of New York,* 204 A.D.2d 109, 111, 611 N.Y.S.2d 533, 534 (1st Dep't 1994) (party with right to terminate may do so "without court inquiry into whether the termination was activated by an ulterior motive"); *Major Oldsmobile, Inc. v. General Motors Corp.,* 1995 WL 326475, at *8 (S.D.N.Y. May 31, 1995) ("[S]ince defendant had the right to terminate the Agreement upon plaintiff's breach, it is legally irrelevant whether defendant was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract.") (citing cases).

### 3. Tortious Interference With Contract

 "A claim of tortious interference [with contract] requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153 (1996). Further, "economic interest is a defense to an action for tortious interference with a contract unless

there is a showing of malice or illegality." *Id.* at 750, 642 N.Y.S.2d 583, 665 N.E.2d 153. Since Liberty was clearly acting in its own economic self-interest and was exposing itself to liability under its bond by instructing Maris to walk off the job, the Court ruled that there could be no malice as a matter of law. In any event, the Court's trial ruling became academic once the jury found Morganti in breach.

#### 4. *Tortious Interference With Business Relations*

To state a claim for tortious interference with business relations under New York law, plaintiff must allege: (1) business relations with a third party; (2) defendant's interference with those business relations; (3) defendant acted with the sole purpose of harming the plaintiff or, where defendant acted to advance its own competing interests, the defendant used dishonest, unfair, or improper means, such as criminal or fraudulent conduct, and (4) injury to the relationship. *See Universal Marine Med. Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 221 (E.D.N.Y.1998) (citing *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994)). In dismissing this claim, the Court noted that Morganti was not contending that Liberty's actions "were designed solely to harm Morganti rather than advance [its] own interest. And more fundamentally, there is nothing here that suggests that there was any criminal or fraudulent conduct on the part of Liberty." Tr. at 225. Again, the jury's verdict rendered the claim academic.

### C. The Jury Instructions

#### 1. *The Liability Charge*

With respect to breach for failure to make timely payments, the Court charged the jury that it could consider certain aspects of the Prompt Payment Act, 31 U.S.C. §§ 3901–3907 (1983 & Supp.

2000) (sometimes "the Act"). Morganti objected to this part of the charge, Tr. at 2077, and renews its objection in its Rule 59(b) motion. Regarding the Act, the jury was instructed:

> on the issue of payment, you may also consider whether Morganti withheld payments from Maris for reasons that did not relate to Maris's work or responsibilities and was not withheld by the government.

> You may consider in that regard the application of the facts as you find them to the federal Prompt Payment Act, which is a federal statute that provides if a contractor intends to withhold any payment from a subcontractor, the contractor must notify the government and the subcontractor of the amount to be withheld, the reason for the withholding, and what the subcontractor must do to get the monies released to the subcontractor.

> Now remember in all of what I'm saying, you have to view all of this in the context of what I told you about materiality and about the covenant of good faith and fair dealing and about the election of the remedy to cure a breach. So remember that. That applies to whatever I'm saying here. That is the structure.

Tr. at 2100.

> The Prompt Payment Act provides:

> [e]ach construction contract awarded by an agency shall include a clause that requires the prime contractor to include in each subcontract for property or services entered into by the prime contractor and a subcontractor (including a material supplier) for the purpose of performing such construction contract— (1) a payment clause which obligates the prime contractor to pay the subcontractor for satisfactory performance un-

der its subcontract within 7 days out of such amounts as are paid to the prime contractor by the agency under such contract . . . .

31 U.S.C. § 3905(b). The Act also requires the contractor to provide

> written notice of any withholding . . . issued to a subcontractor (with a copy to the Government of any such notice issued by a prime contractor), specifying -
>
> (1) the amount to be withheld;
>
> (2) the specific causes for the withholding under the terms of the subcontract; and
>
> (3) the remedial actions to be taken by the subcontractor in order to receive payment of the amounts withheld.

*Id.* at § 3905(g).

Morganti argues that it was error for the Court to reference the Prompt Payment Act because there is no private right of action under the Act; consequently, it cannot serve as a separate basis for liability. The only court directly addressing this issue has held that the Act does not create a private right of action between contractors. *See United States ex rel. Virginia Beach Mech. Servs., Inc. v. SAMCO Constr. Co.,* 39 F.Supp.2d 661, 677 (E.D.Va.1999). The Court recognized at trial that Maris was not bringing a separate claim under the Prompt Payment Act, Tr. at 2080, and the Court's instructions to the jury did not state otherwise. In any event, the Prompt Payment Act does not "limit or impair any contractual, administrative or judicial remedies otherwise available to . . . a contractor or a subcontractor in the event of a dispute involving late payment or nonpayment by a prime contractor . . . ." 31 U.S.C. § 3905(j). Although referencing the Prompt Payment Act, the Court was simply advising the jury as to some of the factors it could consider in assessing whether Morganti appropriately processed Maris's demands for payment. These were factors that the jury could consider in the context of the covenant of good faith even if no mention of the Prompt Payment Act was made. As noted, the Court instructed the jury that it has "to view all of this in the context of what I told you about materiality and about the covenant of good faith and fair dealing." Tr. at 2100; *see also De Falco v. Bernas,* 244 F.3d 286, 318 (2d Cir.2001) (when considering the propriety of a jury charge, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge") (citations and internal quotation marks omitted). In light of this cautionary instruction, even if it be deemed inappropriate to have referenced the Prompt Payment Act, a new trial is not warranted since this could not have seriously affected the jury's verdict.

### 2. *The Damage Charge*

■ Once again Morganti argues, as it did in its Rule 50(a) motion, that Morganti could not be liable for damages occasioned by the government's fault. There is no need to revisit this fallacious argument in the context of Morganti's Rule 59(a) motion. Morganti does not otherwise appear to be questioning the correctness of the Court's damage charge other than to contend that the Court should have charged the jury that Maris had a responsibility to mitigate its damages.

The appropriateness of the damage charge as to profit and overhead was in keeping with the law noted in the Court's discussion and resolution of those reserved issues. As for how the jury was to discern damages in *quantum meruit* for "the fair value of the work, labor and services performed by Maris up to the date when Maris terminated the contract and left the job," Tr. at 2478, the jury was instructed that Maris had the burden of proving:

(1) The performance of work, labor and services by Maris for Morganti in good faith; (2) The acceptance of the work, labor and services by Morganti; (3) An expectation by Maris of compensation for such work, labor and services, and (4) The reasonable value of the work, labor and services.

*Id.; see Clark v. Torian,* 214 A.D.2d 938, 938, 625 N.Y.S.2d 370, 371 (3rd Dep't.1995) (identifying these four elements).

The Court also charged the jury that Maris "should not be able to recover damages based upon its own fault." Tr. at 2484; *see Mai Steel,* 981 F.2d at 419 n. 8 (recognizing that "[t]here may be instances when recovery would be inappropriate, such as when ... delay is attributable to the subcontractor's own conduct"). As for mitigation, it is not part of the accepted *quantum meruit* framework and, indeed, Morganti does not cite authority for this proposition. In any event, the legitimacy of Maris's conduct is subsumed by the "good faith" and "reasonable value" aspects of the Court's *quantum meruit* charge.

### D. The Court's Management of the Trial

Morganti lists a number of complaints about the Court's management of the trial. Morganti objects, without elaboration, to virtually every substantive ruling. In addition, Morganti believes that the Court (1) unfairly restricted Morganti's time to present its case; (2) unduly restricted Morganti's right to introduce documentary evidence and examine witnesses regarding such documents; (3) unfairly interrupted Morganti's direct and cross-examinations; (4) inappropriately engaged in an *ex parte* conference with counsel for Liberty and

Maris on the evening of June 6, 2000, and (5) unfairly marshaled Maris's damages evidence for the jury.

This was an exceedingly difficult case for the Court to manage. The Court has borne witness to the prescient observations of Judge Parker: "Major construction projects generate major construction litigation. Management of either is perilous." *Morse/Diesel, Inc. v. Trinity Indus., Inc.,* 67 F.3d 435, 437 (2d Cir.1995). The animus that pervaded the courtroom between the warring parties was palpable. There was little, if any, spirit of cooperation between the attorneys. If left to the parties' own devices, hundreds of additional exhibits would have been submitted to the jury, and the trial probably would still be going on. Upon its review of the record, the Court is satisfied that, in spite of these difficulties, it made painstaking efforts to afford all parties a fair trial, and is confident that anyone reviewing the record will agree. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) ("[A] litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials.") (citations and internal quotation marks omitted).

### IV. Maris's Rule 50(b) Motion

Included in Maris's claim for costs were two sums which the Court did not allow the jury to consider: (1) $71,142 of costs which the parties stipulated were incurred from January 1995 through April 30, 1995; (2) $611,714.71 of costs allegedly incurred prior to January, 1995. The Court disallowed the claimed pre-January 1995 costs for lack of evidentiary support.[18] As for the stipulated post–1995 costs through April of that year, the parties agreed that

---

18. Maris has withdrawn a second ground for Rule 50(b) relief, challenging the Court's preclusion of certain costs in connection with

payments made to two of Maris's subcontractors. *See* Ltr. From Kevin M. Gary, Esq. to the Court, dated Oct. 23, 2000.

their allowance would depend on the Court's interpretation of a certain document entitled "Partial Release and Waiver of Mechanic's Lien and Payment Bond Rights" ("Release") executed by Maris's Vice President on June 21, 1995.

## A. The Release

The Release states that Maris

acknowledges receipt of payment for all labor, materials or services up to and including the date of 30 April 95 ... the 'release date' paid by Morganti ... and ... Trataros, ... [and Maris] has to the release date remised, released and forever discharged ... Morganti ... American Home Assurance Company ... Trataros ... and Seaboard ... of and from all, and all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialities, covenants, contracts, controversies, agreements, executions, claims and demands whatsoever, in laws, in admiralty, or in equity ... which [Maris against Morganti, American Home, Trataros or Seaboard] ever had, now had or which it or its successors, hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the 're-lease date', and especially in connection with any and all claims of any nature whatsoever arising out of the construction project known as the Metropolitan Detention Center ....

Ex. 4022.

Maris contends that the Release merely acknowledges a partial payment under the Subcontract. It argues, in any event, that because damages are in *quantum meruit*, all of Maris's damages are outside the Subcontract and, therefore, not subject to the Release.

■ Under New York law, when a release is clear and unambiguous, it will be interpreted without resort to parol evidence and strictly enforced. *See Albany Sav. Bank v. Halpin*, 117 F.3d 669, 672 (2d Cir.1997) (citation omitted); *see also Mangini v. McClurg*, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386 (1969) (a release must be given its "full literal effect" unless it can be shown that the transaction to which the release is said to apply was not contemplated "despite the generality of the language in the release form").

■ Maris's contention that the Release is nothing more than an acknowledgment of payment runs contrary to the clear language of the Release. It is a full general release. Maris's reliance on *JRDM Corp. v. U.W. Marx Inc.*, is unavailing since the release in that case was "expressly limited to 'the extent of the payment, only.'" 252 A.D.2d 854, 675 N.Y.S.2d 691, 693 (3d Dep't 1998) (slip op.)

Also unavailing is Maris's alternative contention that the rescission of the underlying contract vitiated the Release. A party may not recover in *quantum meruit* where a valid written agreement exists, the scope of which clearly covers the dispute between the parties. *See Reilly*, 181 F.3d 253, 262–63 (2d Cir.1999) ("Under New York law, the existence of an express contract governing a particular subject matter ordinarily precludes recovery in *quantum meruit* for events arising out of the same subject matter.") (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987)); *see also Adler Constr. v. United States*, 191 Ct.Cl. 607, 423 F.2d 1362, 1366 (1970) (finding in action for *quantum meruit* damages no authority for "novel proposition" that a "release predicated on the terms of a pro-

vision in a contract that itself is void necessarily vitiates the release").

## B. Preclusion of Pre–January 1995 Costs

 Notwithstanding the Court's ruling that Maris's claim for pre-May 1995 costs was barred by the Release, the Court separately ruled that there was no evidentiary basis for Maris's claim for costs incurred prior to January 1995. Maris sought to introduce into evidence a one-page document entitled "Summary of Maris 12/8/94 Cost Report" (the "cost report summary") in support of this claim. The court held this document inadmissable because Maris did not comply with Fed. R.Evid. 1006.

At a hearing outside the presence of the jury, Hoover testified that the cost report summary was prepared for trial and was based upon two computer printouts, one of which was "a summary of all these cost codes and the underlying document is each payroll person that was paid on a weekly basis, each expense report that was paid, each invoice that was booked against the job, labor burden, all of those types of things." Tr. at 2322. Hoover stated that the documentation referenced in the computer printouts had been given to Morganti during discovery, but acknowledged that it consisted of thousands of pieces of paper. Tr. at 2330. Neither the cost report summary nor the computer printout contained a specific description or any sense of organization of the original documents, causing the Court to comment, in disallowing the cost report summary, that it was unfair to require Morganti's counsel "to wade through thousands of pieces of paper" in order to find the information referred to in that document. Tr. at 2331. The Court thereafter ruled that Maris's claim for expenses incurred prior to January 1995 would not be permitted to go to

the jury because Maris had not submitted "any documentary evidence at all to support that in accordance with the rules of evidence." Tr. at 2359. The Court further commented:

> I'm not going to allow [Maris] to go forward with this part of [its] damage claim.... [Maris has] miserably failed to comply with any pretrial requirements that I have requested of the parties in this very complex, burdensome, paper-oriented case and I'm not going to allow [Maris] to do this at the eleventh hour and claim that '[Morganti's counsel] has everything because we gave you these thousands of pieces of paper over the prior four years.'

*Id.*

The Court's ruling should have come as no surprise because during pre-trial conferences and, again, at the outset of the trial, the Court emphasized the need for counsel to make provident use of Rule 1006 and strictly adhere to its disclosure requirements:

> I have beseeched Mr. Torre and everybody during our pretrial conferences to utilize 1006 of the Federal Rules of Evidence and I thought that I had made myself clear.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Now, it seemed to me that when I exhorted Mr. Torre to comply with 1006, it would obviate the need to present voluminous underlying documents to a lay jury, and I instructed that this would be the appropriate case to make good use of 1006.
>
> I was assured that all the underlying documents dealing with payments, et cetera, have been disclosed to counsel. I accepted that representation, and then we received all these cartons in court yesterday, lined up. I told Mr. Torre, I don't understand why we have all these

voluminous documents. The whole purpose of my commentary during pretrial conferences was to avoid that. Get them out of the courtroom and have for the jurors the proper use of summaries under 1006. That's what I asked them to do. Apparently, I wasn't clear enough, for which I apologize, but perhaps I was clear enough, but be that as it may, I am now perfectly clear on the record.

\* \* \* \* \* \*

I also explained to you that the common example of the use of 1006 would be to use checks. Many times we have commercial cases where there are lots of checks. Rather than introduce three thousand checks, we can have a chart that shows in column form the number of the check, the date of the check, the amount on the check, the payee on the check. That's fine. That's factual information that flows from the underlying documents. That's what you are to use in this case.

Tr. at 157–60.[19]

Rule 1006 provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Rule 1006 is "based on the common-law rule that a party may prove the contents of voluminous writings that cannot be exam-

ined in court without causing inconvenience and waste of time by presenting evidence of their contents in abbreviated form." 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 1006.02 (2d ed. 1997) ("*Weinstein's Evidence*"). A "quintessential summary" is one "used to facilitate the jury's deliberations and to avoid forcing the jury to examine boxes of documents in order to make simple calculations." *Fagiola v. National Gypsum Co.*, 906 F.2d 53, 57 (2d Cir.1990).

"Summary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party." *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir.1993). The material must be made available in sufficient time to permit examination, preparation of a response to the summary, and avoidance of surprise and costly delays at trial. *See Weinstein's Evidence* § 1006.06[1].

"[T]o satisfy the 'make available' requirement, a party seeking to use a summary under Rule 1006 must identify its exhibit as such, provide a list or description of the documents supporting the exhibit, and state when and where they may be reviewed." *Air Safety v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir.1996). Thus, Rule 1006 "operates independently of the discovery rules." *Air Safety*, 94 F.3d at 8 (citing *Weinstein's Evidence*). It is "[not] enough to say that the documents have been available or could have been available or were available when they were not identified as the source for [a] summar[y]," *id.*; "passive availability" may be satisfactory in the

---

**19.** Consistent with this ruling, the Court received in evidence, pursuant to Rule 1006, an eight-page document summarizing approximately 400 checks written after January 1, 1995, totaling $6,737,944. *See* Tr. at 2179–81; Maris Ex. 3005. These checks, which included the $71,142 barred by the Release, served as the basis for the $6,593,997 claimed by Maris as its actual costs (other than its payments to Genetech and Beach). *See* n. 8, *supra*.

context of general discovery, but it does not fulfill the separate obligation imposed by Rule 1006. *Id.*

The Court acted well within its discretion in deciding not to allow the cost report summary in evidence. Maris never provided a list or description of the documents supporting the proposed 1006 exhibit; nor had it given the cost report summary to Morganti in sufficient advance of trial to allow meaningful review of the mass of material Morganti had received during the years of discovery to determine the accuracy of the cost report summary. It would have been a gross abuse of the appropriate utilization of Rule 1006 if the Court were to have ruled otherwise.

### V. Prejudgment Interest

■ New York's law providing for a nine percent per annum rate of prejudgment interest in contract actions, *see* N.Y. C.P.L.R. 5001(a), 5004, extends to *quantum meruit* recoveries in quasi-contract actions. *See Port Chester Elec. Constr. Corp. v. HBE Corp.*, 782 F.Supp. 837, 848 (S.D.N.Y.1991), *rev'd on other grounds*, 978 F.2d 820 (2d Cir.1992); *Ogletree, Deakins, Nash, Smoak & Stewart P.C. v. Albany Steel Inc.*, 243 A.D.2d 877, 879, 663 N.Y.S.2d 313, 315 (3d Dep't 1997). The Miller Act does not preclude such recovery. *See United States ex rel. Balf Co. v. Casle Corp.*, 895 F.Supp. 420, 429 (D.Conn. 1995) (awarding prejudgment interest in a Miller Act action at the state rate); *United States ex rel. F & G Mech. Corp. v. Manshul Constr. Corp.*, No. 94 CV 2436(CLP), 1998 WL 849327, at *27 (E.D.N.Y. Oct.1, 1998) (awarding Miller Act prejudgment interest at the New York rate); *United*

States ex rel. Strober N.J. Bldg. Supply Ctrs., Inc. v. Aetna Cas. & Sur. Co., No. 94 CV 5283, 1995 WL 450977, at *1 (E.D.N.Y. July 21, 1995) (same). Maris is entitled to nine percent per annum prejudgment interest from May 3, 1996. *See* N.Y. C.P.L.R. 5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed.").[20]

### CONCLUSION

If Maris accepts remittitur to $409,927 on the jury's profit award, it shall settle judgment within thirty days from the date of entry of this Decision and Order. Otherwise, the case will be set down for retrial on profit damages. If judgment is to be settled, the judgment against Morganti will be for the sum of $2,730,503 ($6,576,-997 for costs, plus $409,927 on the remittitur, less the $4,256,421 previously paid), together with prejudgment interest at the rate of nine percent per annum from May 3, 1996. The proposed judgment undoubtedly will also embrace Morganti's sureties' liability on the payment bond. Presumably, it will provide for joint and several liability by the sureties with Morganti in the sum of $2,500,000, plus interest—the amount alleged in the Miller Act claim. *See* Compl. ¶¶ 14–16. If the Court's presumption is incorrect, the parties will notify the Court, prior to the settlement date, of the nature of their disagreement so that the Court may determine the course of further proceedings in that respect.

**SO ORDERED.**

---

**20.** The Court rejects, as spurious, Morganti's claim that "Maris elected to predicate its breach of contract claim on Morganti's alleged violations of the Prompt Payment Act, [therefore, Maris] is precluded from obtaining an award of prejudgment interest." Morganti's Mem. of Law, at 20. As previously noted,

Maris did not assert a separate claim under the Act, and, in any event, the Act's interest provision in reference to subcontracts, *see* 31 U.S.C. § 3905(b)(2), does not preclude "any ... judicial remedies otherwise available." 31 U.S.C. § 3905(j).